IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
**CIVIL COMPLAINT NUMBER: 19-CV-4616**

**COURT OF APPEALS NUMBER 24-1696**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

**Derrick Jacobs**
Plaintiff – Appellant

v.

**City of Philadelphia, et al**
Defendants – Appellees

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA (2:19-CV-4616)
APPELLANT'S BRIEF AND APPENDIX VOLUME I (APP 001-037)**
*Oral Argument Requested*

---

## <u>REASON WHY ORAL ARGUMENTS SHOULD BE HEARD</u>

Pursuant to Rule 34 (a) of the Federal Rules of Appellant Procedure ("FRAP"), Appellant respectfully request oral argument. I believe oral argument will assist this Court in deciding this appeal, which contain involves important legal issues. Oral argument will enable the parties to address these issues adequately and respond to the Court's questions and concerns.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………..i

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION….1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW…………………1

STATEMENT OF RELATED CASES AND PLEADINGS…………………………2

STATEMENT OF THE CASE……………………………………………2

SUMMARY OF THE ARGUMENT……………………………………6

ARGUMENT…………………………………………………………7

   A. APPLICABLE STANDARD OF REVIEW………………………………7

   B. THE DISTRICT COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FIRST AMENDMENT MALICIOUS PROSECUTION………………………………………8

   C. THE DISTRICT COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FIRST AMENDMENT RETALIATION………………………………………………12

   D. THE DISTRICT COURT ERRED IN DISMISSING THE PLAINTIFF'S CONSPIRACY CLAIM………………………………………16

   E. THE DISTRICT COURT ERRED IN DISMISSING CITY OF PHILADELPHIA………………………………………16

   F. THE DISTRICT COURT ERRED DENYING PLAINTIFF'S REQUEST FOR RECUSAL………………………………………16

G. THE DISTRICT COURT ERRED IN CLAIMING DEFENDANTS' IMMUNITY DEFENSE……………………………………………………...24

2. THE DISTRICT COURT ERRED IN DISMISSING PLAINTIFF'S PENNSYLVANIA WHISTLEBLOWER CLAIM…………………………25

CONCLUSION…………………………………………………………...…30

APPENDIX VOLUME I (INCORPORATED AFTER THE BRIEF)


NOTICE OF APPEAL……………………………………APP'X 001-002

DISTRICT COURT JUDGMENT……….APP'X 003

DISTRICT COURT ORDER…APP'X 004

MEMORANDUM OPINION…..APP'X 005-APP 037

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Hall v. Clifton Precision (EDPA 1993)...........................................10, 23

Javitz v. Luzerne County (3rd Cir. 2019)......................................12

Lane v. Franks 573 U.S. 228, 241 (2014)........................................13

Connick v. Myers, 461 U.S. 138, 146 (1983)....................................13

Baldassare v. State of N.J., 250 F.3d 188, 196-97 (3rd Cir. 2001)...................13

Dougherty v. School District of Philadelphia 772, F.3d 979 (3rd Cir. 2014).........13

Garcetti 547 U.S. at 421............................................................13

Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019)...............12

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).......................16

Del. River Port Auth v. Transamerica Trailer Transport, Inc (1994)............17

Heck v. Humphrey, 512 U.S. 477, 484, 489 (1994).....................6, 28, 29

Halsey v. Pfeiffer, 750 F.3d 273, 287, 288 (3d Cir. 2014)...........................7

Peroza-Benitez, 994 F.3d at 165......................................................7

Tolan v. Cotton, 572 U.S. 650, 657 (2014)..........................................7

Hugh v. Butler Cty. Family YMCA , 418 F.3d 265, 266-67 (3d Cir. 2005)..........7

Dennis v. City of Philadelphia, 19 F.4th 279, 290 (3d Cir. 2021)...................8

Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017)............................8, 24

Hartman v. Moore, 547 U.S. 250, 256, 259, 260 (2006)...........................8, 9

Crawford-El v. Britton, 523 U.S. 574, 592..........................................9

Ashcroft Kidd, 553 U.S. 731, 736 (2011)............................................9

Wallace v. Kato, 549 U.S. 384, 387-390 (2007)……………………..………...9, 28

Wheeler v. Nesbitt, 24 How. 544, 549-550 (1861)………………………….………9

Brown v. Selfridge, 224 U.S. 189, 191 (1912)………………………….………9

Imbler v. Pactman pp. 271-276……………………………………………….………9

Andrews, 895 F.2d at 1480–81…………………………………...………………10

Wharton v. Vaughn 01-cv-6049…………………………………….………11

Rehberg v. Paulk, 566 U.S. 356, 361 (2012)………………………………....12

Schneyder v. Smith, 653 F.3d 313, 318–19 (3d Cir. 2011)…………….……...12

Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)………………….……12

Hill v. City of Scranton, 411 F.3d 118, 126 n.11 (3d Cir. 2005)…………….…15

Shelton v. Bledsoe, 775 F.3d 554, 565 (3d Cir. 2015)……………………….…23

Donahue, 280 F.3d at 383………………………………………..…………….…29

Young v. Quinlan, 960 F.3d 351, 360 (n.21)………………………..………….…30

Wilson v. Seiter, 893 F.2d 861, 866 (6th Cir. 1990)……………..…………….…30

Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265 (5th Cir. 1991)……....30

Miller v. FDIC, 906 F.2d 972, 974 (4th Cir. 1990)………………………………30

Ghana v. Holland, 226 F.3d 175, 184 (3d Cir. 2000)……………………….…..30

Reichle v. Howards, 566 U.S. 658, 664 (2012)………………………..………….…30

**Statutes**

28 U.S.C. § 455

42 U.S.C. § 1983

42 U.S.C. § 1981

234 Pa. Code Rule 556.10

42 Pa. C.S. § 4549(b)

Federal Rules of Civil Procedure

PENNSYLVANIA WHISTLEBLOWER LAW Act of Dec. 12, 1986,
P.L. 1559, No. 169.......................................................24

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and/or 28 U.S.C. § 1343, as this is a civil action to redress the deprivation, under the color of State law, of rights and privileges secured by the Constitution of the United States and §§ 1983 and 1981. The amount in controversy significantly exceeds jurisdictional minimum.

This Honorable Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

The District Court by Memorandum, Order, and Judgment dated and filed March 21, 2024 granting the defendants' motion for summary judgment and denying the plaintiff's motion for summary judgment. The plaintiff's claims were based upon the First Amendment Retaliation and Malicious Prosecution, Fourth Amendment unreasonable Searches and Seizures. Six Amendment Right to Counsel, and Fourteenth Amendment Due Process after the plaintiff attempted to report corruption and criminality by public officials.

On April 15, 2024 the plaintiff gave Notice of Appeal which was docketed on April 23, 2024 at number 24-1696. This appeal is accordingly from a final Order and/or Judgment that disposed of all the parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Did the District Court err by granting the defendants' motion for summary judgment for all claims without any supporting evidence and not viewing the genuine material disputes in favor of the non moving party (Jacobs) as required by FRCP Rule 56?

Did the District Court err by denying the plaintiff's motion for summary judgment without any genuine material disputes presented by the defendants? The plaintiff clearly showed a fabricated malicious criminal proceeding was initiated against the plaintiff after the State actors learned he was a "Whistleblower" attempting to report their corruption and criminal activity. The plaintiff also clearly showed a fabricated/retaliatory departmental investigation was initiated after the filing of this complaint. The defendants have not produced any items of evidentiary value to refute the plaintiff's claims of malicious prosecution and retaliation.

Did the District Court err by dismissing the plaintiff's Pennsylvania Whistleblower complaint?

Did the District Court err by denying plaintiff's motion requesting recusal under 28 U.S.C. § 455.

Did the District Court err by denying plaintiff leave to amend according to FRCP 15(a)(1)(B)?

Did the District Court err as was required and view the complaint in favor of the non moving party according to the Federal Rules of Civil Procedure ("FRCP").

RAISED/PRESERVED: The issues were raised/preserved in plaintiff's filings.

## STATEMENT OF RELATED CASES

Jacobs v. City of Philadelphia, et al. Third Circuit Court of Appeals 20-1967

Jacobs v. City of Philadelphia, et al. Third Circuit Court of Appeals 21-2314

Pownall v. Lawrence Krasner, Tracy Tripp, and City of Philadelphia Third Circuit Court of Appeals 23-2049

## CONCISE STATEMENT OF THE CASE

### Detective Derrick Jacobs observed consulting with counsel and subsequent criminal proceeding

On September 27, 2018 Detective Derrick Jacobs ("Jacobs") was in courtroom 1007 of the Criminal Justice Center ("CJC") on a homicide trial.

On September 27, 2018 Assistant District Attorney Tracy Tripp ("Tripp") was in courtroom 1005 of the CJC attending a bypass hearing relating to the Officer Involved Shooting ("OIS") by former Philadelphia Police Officer Ryan Pownall ("Pownall"). Pownall was represented by Fraternal Order of Police ("FOP") attorney Fred Perri ("Perri").

On September 27, 2018 Tripp observed Jacobs consulting with known FOP attorney Perri. Tripp fearing Jacobs was consulting with the attorney regarding the criminal activity at the DAO immediately contacted Jacobs' Commanding Officer Jason Hendershot ("Hendershot"). Tripp informed Hendershot she would arrest any member of the Officer Involved Shooting Investigation Unit ("OISI") for consulting with Perri. Hendershot contacted Jacobs and relayed Tripp's comments. Jacobs informed Hendershot there was no need to threaten other members of OISI Jacobs was consulting with Perri regarding the corruption and criminality at the

DAO *Note: this was a frequent conversation between Hendershot and OISI members*).

On or about October 16, 2018 Jacobs learned that the DAO, headed by Philadelphia District Attorney Lawrence Krasner ("Krasner"), and Tripp had fabricated a grand jury leak story in an effort to initiate criminal proceedings against Jacobs to chill his speech. Jacobs later learned the grand jury leak story was an effort to intimidate Jacobs into silence. Jacobs was later informed the DAO wanted him silenced until after the Pownall criminal trial. Jacobs' partner, Detective William Sierra ("Sierra"), was also implicated in the concocted fabricated grand jury leak story.

On or about November 9, 2018 Jacobs' attorney Greg Pagano ("Pagano") informed Jacobs he needed to remain silent until after the Pownall trial. Pagano told Jacobs if he remained silent everything (criminal proceeding) would go away.

Sometime in May 2019 Hendershot informed Jacobs and Sierra the criminal prosecution against them would be dropped because the DAO "lost the transcripts."

On August 1, 2019, while Jacobs was being sworn into another grand jury (serial killer), Tripp hastily approached him and informed him the criminal prosecution against him was being withdrawn and she did not think "Greg" (Pagano) would mine her relaying that information.

### Detective Derrick Jacobs files Federal Civil Rights lawsuit

On October 4, 2019, Jacobs commenced this lawsuit. On that same date Jacobs asked then Philadelphia Police Commissioner Christine Coulter ("Coulter") for "Whistleblower" protections.

### The BigTrial.net article regarding Detective Derrick Jacobs lawsuit

On Monday, November 18, 2019, Ralph Cipriano, a frequent critic and some would say nemesis of Krasner, published an article on his website BigTrial.net. The article was titled: **"Detective: D.A. Tampered With Witness In Officer Involved Shooting."**

On Monday, November 18, 2019, Hendershot texted Jacobs the following at 12:05 PM "see me when you're done with court, please." When Jacobs responded Hendershot informed Jacobs he was taking Jacobs' City issued police vehicle, restricting Jacobs from responding to assignments. Jacobs informed Hendershot this is retaliation for the federal lawsuit filed by Jacobs. Hendershot refrained from

taking Jacobs' vehicle at that time (*Note: On November 18, 2019 Hendershot shut down Jacobs' mobile communications without informing Jacobs. Jacobs would not receive notifications of Officer Involved Shootings ("OIS") as a result*).

### Detective Derrick Jacobs meeting with Deputy Police Commissioner Dennis Wilson on November 26, 2019

On November 26, 2019 Jacobs informed Hendershot he is going to the Inspector General's Office to report Krasner's and Tripp's corruption. Jacobs first contacted the Office of the State Inspector General at 215-560-1500 at 12:51 PM. Jacobs informed the party he was attempting to report corruption at the Philadelphia District Attorney's Office. Jacobs was referred to the City of Philadelphia "Whistleblower" section of the Office of Inspector General. Jacobs contacted the City's Office of Inspector General at 215-686-1770 at 12:54 PM. Jacobs also contacted City Solicitor Nicole Morris at 215-683-5075 at 1:03PM. Ten minutes after contacting Nicole Morris Hendershot contacted Jacobs at 1:13PM. Hendershot informed Jacobs Deputy Philadelphia Police Commissioner Dennis Wilson ("Wilson") wanted him to report to his office immediately. Wilson informed Jacobs he would not allow him to discuss (1) "Whistleblower" protections with Police Commissioner Coulter. (2) He would not refer Jacobs' criminal allegations against Krasner and Tripp to the United States Attorney (William McSwain) until after Jacobs first consults with the Pennsylvania Attorney General's Office ("AGO"). Jacobs informed Wilson there was a conflict of interest with the AGO because of their involvement in the Pownall OIS investigation. (3) He was aware of the BigTrial.net article and did not have an issue with Jacobs discussing his claims with media sources (*Note: Jacobs also informed Wilson of Chris Palmer and Christopher Norris contacting Jacobs*).

On November 26, 2019 Jacobs contacted Hendershot after the meeting with Wilson and informed him of "all" the topics of discussion. Hendershot then texted Jacobs contact information of an AGO supervisor to honor Wilson's request of first consulting with the AGO. On November 27, 2019 Jacobs contacted the supervisor at the AGO. The supervisor informed Jacobs the criminal allegations would need to be referred to the US Attorney (William McSwain). Jacobs contacted Hendershot and informed him of the topics discussed with the AGO and asked if he could relay them to Wilson. Almost daily (excluding Hendershot's mother's death) Jacobs asked Hendershot if he had contacted Wilson and if the criminal allegations had been referred to the US Attorney. On each occasion, Hendershot indicated he had not received a response from Wilson. *Note: Due to public criticisms by then United States Attorney William McSwain leveled at Krasner, Wilson was ordered by Krasner not to refer Jacobs' criminal allegations.*

**Plaintiff, Derrick Jacobs appears on a podcast to discuss his litigation against the DAO, Krasner, and Tripp**

On Saturday, January 18, 2020, while off-duty with personal equipment, Jacobs appeared on a podcast and discussed his/this litigation.

On January 20, 2020, Jacobs informed Hendershot that he participated in the podcast and the topics discussed (*Note: Jacobs informed Hendershot of his future participation on January 17, 2020*).

On January 21, 2020, Hendershot informed Jacobs that Wilson wanted immediately disciplinary action taken against Jacobs for his participation in the podcast. Hendershot informed Jacobs "you did not do anything wrong, the most they could do is give you a counseling memo." *Note: Wilson made this determination without listening to a "single" word on the podcast. Wilson was ordered by Krasner from multiple sources and was told not to "retaliate" against Jacobs (App). The PPD did not obtain podcast CD until January 24, 2020 (App'x 211).*

On January 30, 2020, Hendershot interviewed Jacobs in reference to the podcast. During the interview Jacobs informed Hendershot he was contacted as a result of being a Whistleblower reporting corruption. Jacobs also informed Hendershot he received permission to go public with his corruption allegations from Wilson during the November 26, 2019 meeting. Jacobs informed Hendershot multiple times during the interview he was/is a "Whistleblower." Jacobs also once again asked for his criminal allegations to be referred to the United States Attorney. *FOUR MINUTES AFTER JACOBS' DISCIPLINARY INTERVIEW THE DEFENDANTS RECOMMENDED TERMINATION (HENDERSHOT AND FORMER CHIEF INSPECTOR OF INVESTIGATIONS FRANK VANORE now Deputy Police Commissioner).*

On February 10, 2020, Jacobs was charged with Conduct Unbecoming an Officer "UNSPECIFIED" for his participation in the podcast. The penalty is termination.

**Malicious, Retaliatory, and Egregious Conduct by the Defendants in response to the Plaintiff exposing numerous acts of criminal activity and corruption**

The defendants cannot produce and the District Court did not observe a shred of evidence in support of their actions against the plaintiff. The plaintiff has

not violated any Departmental Policy. The plaintiff has not committed any illegal acts (EMPHASIS ADDED!).

The DAO has targeted the plaintiff on account of his race and knowledge of their criminal activity since Krasner became Philadelphia District Attorney. The Philadelphia Police Department ("PPD") joined and conspired to retaliate against the plaintiff after the filing of his lawsuit(s).

This DAO has coerced perjured from witnesses, released attempted murderers of Law Enforcement Officers ("LEO") for financial gain, and released convicted murderers from prisons by conspiring with murderers and defense attorneys to fabricate claims of misconduct by LEO for financial gain.

In an effort to cover up their criminal activity that has cost the City millions of dollars and hundreds of lives, the defendants retaliated, created a hostile work environment, and constructively discharged the plaintiff.

## SUMMARY OF THE PLAINTIFF'S ARGUMENT

The District Court erred in granting the defendants' motion for summary judgment.

The District Court erred in denying the plaintiff's motion for summary judgment.

The District Court erred in dismissing the plaintiff's First Amendment Malicious Prosecution claims after the defendants intentionally fabricated a grand jury leak story to chill the plaintiff's speech from exposing their corruption, threatening the plaintiff with prosecution, if he continued to expose their corruption.

The District Court erred by dismissing the plaintiff's First Amendment Retaliation claims after the defendants retaliated against the plaintiff for filing a federal Civil Rights complaint.

The District Court erred by dismissing the plaintiff's Pennsylvania Whistleblower Law claim as time barred. The law is clear malicious prosecution claims accrues when the proceeding ends in the plaintiff's favor. *Heck v. Humphrey, 512 U.S. 477, 489 (1994).* The proceedings clearly ended in the plaintiff's favor on August 1, 2019 when Tripp informed Jacobs she was withdrawing prosecution. On October 4, 2019, Jacobs filed this § 1983 claim.

The District Court erred in denying the plaintiff's request for recusal under 28 U.S.C. § 455.

## ARGUMENT

## 1.  THE DISTRICT COURT ERRED IN GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND NOT VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO THE NON MOVING PARTY (PLAINTIFF). THE DISTRICT ERRED IN DENYING THE PLAINTIFF MOTION FOR SUMMARY JUDGMENT.

## A.  STANDARD OF REVIEW

When reviewing a district court's grant of summary judgment, the facts recited are viewed in the light most favorable to the plaintiff, and all reasonable inferences should be made in his favor. *Hugh v. Butler Cty. Family YMCA , 418 F.3d 265, 266-67 (3d Cir. 2005).* Rule 56 of the Federal Rules of Civil Procedure ("FRCP") states summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" FRCP 56(a). A dispute is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. **Rule 56 (c)(1)(A) states a party asserting that a fact cannot be or is genuinely disputed MUST support that assertion by citing to particular parts of materials "in the record," including depositions, documents, ...or other materials.** Rule 56(c)(2) states a party may object that the material cited to support or dispute cannot be presented in a form that would be admissible evidence. "We view the evidence in the light most favorable to the non moving party" and "give that party the benefit of all reasonable inferences that can be drawn from the evidence." Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014); see also Bitner, 455 F.3d at 187 n.1 Our inquiry is guided by the two-prong test for qualified immunity, the first prong being whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right, and the second being whether that right was clearly established. Peroza-Benitez, 994 F.3d at 165. "[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion on both prongs at summary judgment. Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014). It is essential to begin by "fram[ing] the right 'in light of the specific context of the case,'" with all reasonable inferences drawn in the nonmovant's favor. Peroza-Benitez, 994 F.3d at 165-66; accord Tolan v. Cotton, 572 U.S. 650, 657 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even ... [on] the clearly-established prong of the standard."). The Supreme Court has repeatedly cautioned that the qualified immunity inquiry demands a "high 'degree of specificity'" and that courts may not "define clearly established law at a high level of generality," which would "avoid[]

the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). On a number of occasions we have analyzed clearly established rights involving a "subjective state-of-mind element." See, e.g., Dennis v. City of Philadelphia, 19 F.4th 279, 290 (3d Cir. 2021) ("We conclude that the constitutional rule that "framing criminal defendants through use of fabricated evidence, including false or perjured testimony, violates their constitutional rights applies with such obvious clarity that it is unreasonable for us to conclude anything other than that the detectives were on sufficient notice that their fabrication of evidence violated clearly established law.");" Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017). ("[I]f the unlawfulness of the defendant's conduct would have been apparent to a reasonable official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising."). But the un-rebutted evidence at this juncture shows that the Defendants were deliberately trying to violate Jacobs' first amendment right of free speech, fourth amendment unreasonable seizure, six amendment right to counsel, and fourteenth amendment due process. When the defendants (Tripp) observed Jacobs consulting with counsel she contacted Krasner. The defendants acted in concert with others to violate a clearly established constitutional right. The defendants then acted in concert concocting a fabricated story of a grand jury leak to justify their illegal actions against Jacobs. There have not been any documents, testimony, or evidence supporting the defendants conduct and/or the District Court's order granting the defendants summary judgment.

**B.    The District Court erred in granting the defendants' motion for summary judgment for First Amendment Retaliation Malicious Prosecution.**

In order to prevail on a malicious prosecution claim a party must prove the following: (1) the defendants initiated a "criminal proceeding" against the plaintiff (2) the criminal proceeding was initiated against the plaintiff without probable cause (3) the criminal proceeding was initiated against the plaintiff for a purpose other than bring the plaintiff to justice (4) the criminal proceeding ended in the plaintiff's favor. In granting a motion for summary judgment the facts must be viewed in the light most favorable to the non moving party (plaintiff). The facts in this record are clear. There is not one fact in the record that indicates any grand jury leak occurred. The facts in the record indicate a grand jury leak never occurred. The facts in the record indicated the plaintiff was targeted for attempting to report corruption by public officials. The facts in the record indicated Philadelphia District Attorney knew of the malicious prosecution and participated/condoned the action. At a minimum he (Krasner) acquiesced to its

implementation. "...the First Amendment prohibits governmental officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." and engaging in protected speech. *Hartman v. Moore, 547 U.S. 250, 256 (2006) citing Crawford-El v. Britton, 523 U.S. 574, 592.* To prevail on such a claim the plaintiff must establish a "causal connection" between the government defendant's "retaliatory animus" and the plaintiff's "subsequent injury." *Hartman, 547 U.S., at 259.* The Supreme Court has "simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other," shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive. *Hartman, 547 U.S., at 260.* "...because probable cause speaks to the objective reasonableness, *see Ashcroft Kidd, 553 U.S. 731, 736 (2011),* absence as in retaliatory prosecution cases generally provide "weighty" evidence of the animus." At common law, malicious prosecution was marked **"by wrongful institution of the legal process."** *Wallace v. Kato, 549 U.S. 384, 389-390 (2007).* Malicious prosecution required the plaintiff to show that the criminal charge against him "was unfounded, and that the defendant in making or instigating it was actuated by malice." *Wheeler v. Nesbitt, 24 How. 544, 549-550 (1861).* It has long been "settled law" that malicious prosecution requires proving "the want of probable cause." *Brown v. Selfridge, 224 U.S. 189, 191 (1912).* Convening a grand jury to investigate "self planted fabricated evidence to chill a constitutional right" does not transform administrative into prosecutorial. Referencing *Imbler v. Pactman pp. 271-276.* Tripp observed Jacobs in the presence of an attorney "known" to represent the FOP, which Jacobs is a member. Armed with this information Tripp attempted to usurp Jacobs Six Amendment right to counsel by contacting Hendershot, attempting to learn the nature of his privilege communications with counsel *(Note: the District Court later relied and parroted this constitutional violation).* Hendershot informed Tripp that Jacobs was "consulting" with counsel regarding "criminality and corruption" at the DAO. Armed with that information, the DAO concocted a fabrication of a grand jury leak to chill Jacobs' speech from exposing public corruption, which is clearly a matter of public concern. Here is how you know Krasner and Tripp were lying and concocted the grand jury leak fabrication. If Tripp was going to initiate a grand jury leak investigation based upon Perri's comments during the bypass hearing the very first thing you do would be to address the court reported before he/she leaves the courtroom and order the transcripts for the bypass hearing on September 27, 2018. After receiving the transcripts and based upon the notes of testimony it contained you could confirm or deny the possible existence of a grand jury leak. Tripp could have obtained the transcripts prior to the October 16, 2018 court notice to Jacobs. The transcripts definitely could have been obtained prior to the November 9, 2018 court date. If

9

you believe Krasner and Tripp's story of "lost transcripts" then you would have to believe they initiated this proceeding against Jacobs without obtaining the necessary evidence FIRST (best evidence rule). Now the District Court is deciding to parrot the defendants' lies. Tripp would not have had to "believe" what Perri stated at the bypass hearing. Tripp should have already "known" what Perri stated at the bypass hearing PRIOR to initiating any action against Jacobs (if you "believe" their story). The defendants have conceded there was never a grand jury leak. Tripp was asked during her deposition "was there ever a grand jury leak?" In an effort to avoid perjury, Tripp responded "I can't answer that question, sir." (*App'x 270 at 12-13*) Not only did Tripp possess the inability to answer that question, she (through her attorney) **refused to answer over one hundred (100) questions during her deposition, in violation of** *Hall v. Clifton Precision (EDPA 1993)(App'x 212-339)*. The irony here is that the District Court showed its bias when it stated Jacobs' claims of over 100 objections were "patently false" (actually approximately 125 direct the witness not to answer objections) and it needed the "transcript" to assess Jacobs' claims. The District Court does/did not need a transcript accept the defendants' fabrications but needed a transcript from Jacobs for "evidentiary support" (*ECF 161 at 2, 167 at 2*) *emphasis added*. When Tripp was asked was Krasner aware of her illegal activity against Jacobs, Tripp replied yes. (*App'x 282 at 11-14*) A policymaker, as defined under state law, must be "responsible either for the policy or, through acquiescence, for the custom." *Andrews, 895 F.2d at 1480-81*. Defendant Hendershot revealed Tripp and Krasner's nefarious intentions/actions when he was deposed. After a question by Jacobs, **Hedershot responded... "so to call you in front of a grand jury...when that person knew you did not participate, in my opinion, is just wrong."**(*App'x 394 at 11-17*)  Hendershot (who is a defendant in this matter) went further. **Question by Jacobs**: But you knew that what she was alleging was not true, is that correct? **Answer by Hendershot**: *YES!(App'x 396 at 4-6)* This is the record. With these two questions alone there is a "genuine dispute of the material facts" in this matter. Hendershot also testified that Jacobs had conversations with him "prior to the lawsuit being filed" regarding the "impending" retaliation by Krasner. *(App'x 382 at 21-24 and 383 at 1-6)*. In response to a memorandum from Jacobs to Coulter, defendant Deputy Police Commissioner Dennis Wilson ("Wilson") wrote the following: "The PPD is not the proper authority to investigate **"victimization"** by the DA's Office. Refer this complaint to the Attorney General's Office." Wilson did not say you leaked grand jury information. Multiple Courts that have actually reviewed Krasner's DAO. They have confirmed they "lack candor." **(1) Common Pleas Court Judge Barbara McDermott authored the following in dismissing the criminal charges against former Police Officer Ryan Pownall on October 17, 2022:** *(a) "while former ADA Tripp "believed" that she had*

printed out the statutes for each offense and left them on the table for the grand jurors to review, "this Court rejects her assertion" as the Notes of Testimony from August 23, 2018 show that former ADA Tripp did not read the charges to the Grand Jury or provide copies of the relevant statutes." (b) "Former ADA Tripp's assertion that she left the statutes for the Grand Jury was indirectly "contradicted" by former ADA Murphy's testimony." (c) "The Commonwealth made an "intentional, deliberate" choice not to inform the grand jurors about the justification defense under section 508." (d) "A prosecutor **has a duty to be** fair to the accused and **candid to the courts. Prosecutors cannot provide an inaccurate and "misleading" statement of the law to the tribunal.**" (e) "Prosecutors are ethically and legally obligated to ensure that the Grand Jury is provided with an accurate statement of the law." (f) "The Commonwealth committed multiple errors "throughout" the Grand Jury process that prejudiced the defendant." (g) "The Commonwealth was also disingenuous with the Court." **(2) Pennsylvania Supreme Court Justice Dougherty authored the following in his Commonwealth v. Pownall concurring opinion on July 20, 2022:** (a) "A special concurrence is unusual. But so is the Philadelphia District Attorney's Office's ("DAO") prosecution in this case." (b) "...I cannot say the DAO treated Pownall fairly and equally." (c) "This may be the first time in the history of Pennsylvania jurisprudence that a District Attorney requested a grand jury to authorize criminal charges without explaining the law that applies to those charges because to do so would have prevented a finding of probable cause." (d) "...if these allegations are true, as they appear to be, it implicates a potential **abuse of the grand jury process**." (e) "Also significant is the way the prosecution used the presentment. "The DAO successfully moved to unseal it" and then, after charging Pownall, directed the press to its "purported factual findings." Not surprisingly, multiple news sources reported on the presentment's one-sided account, with some even making the full document available online for "anyone and everyone" to read." (f) "Little has happened in this case up to this point reflects procedural justice. On the contrary, the DAO's prosecution of Pownall appears to be "driven by a win-at-all-cost office culture" that treats police officers differently than other criminal defendants." **(3) Pennsylvania Common Pleas Court Judge Karen Simmons excoriated the exact same parties maliciously prosecuting the plaintiff. Judge Simmons excoriated Assistant District Attorney Rachel Black of the DAO corrupt Special Investigation/Conviction Integrity Unit("DAOSIU/CIU"). This unit's intentions are to illegally prosecute police officers and illegally free convicted murderers, which was/is being exposed by Jacobs. After catching Black in a lie and summoning her supervisors (Tripp, Cummings, Winkleman, etc.), Judge Simmons stated** "I REALIZED I had enough because if I can't trust Ms. Black or "anyone else" from the District Attorney's Office who

*are prosecuting these cases...then I don't know what to do with you, actually, I really don't."* **(4) Federal Court Judge Mitchell Goldberg (Eastern District of Pennsylvania) authored the following in his rebuke of the DAO** *Wharton v. Vaughn 01-cv-6049***:** *(a) "After raising concerns regarding the District Attorney's candor... a hearing was held to allow the District Attorney's Office, if they so chose, to offer explanations." (b) "The District Attorney's Office continues to press that although it is a public, prosecuting office, a heightened duty of candor does not apply to its communications with the Court."* A DAO that *"lacks candor"* to every court that investigated its claims received all considerations from This District Court. Four Judges and a Decorated Detective claimed the defendants lacked candor and abused the grand jury process to achieve its "desired" goals/agenda but this District Court granted summary judgment to the moving party. If the facts were viewed in the light "most favorable" to the nonmoving party by the District Court it is impossible and precludes the District Court from granting summary judgment in the defendants' favor. Based upon the above listed facts, the defendants' motion for summary judgment should be vacated. The plaintiff's motion for summary judgment should be granted. That statute derived from § 1 of the Civil Rights Act of 1871 provides litigants an avenue to obtain money damages where state and local officials violate their federal constitutional or statutory rights. Rehberg v. Paulk, 566 U.S. 356, 361 (2012); Schneyder v. Smith, 653 F.3d 313, 318–19 (3d Cir. 2011). Finally, the District Court erred by not allowing "new evidence" on numerous occasions and the plaintiff leave to amend. Some of the new evidence included the City of Philadelphia Law Department Chief Deputy City Solicitor Danielle Walsh had commissioned a report from a risk management firm. The report was completed in 2022. The firm was charged with investigating the practices at the Philadelphia District Attorney's Office Special Investigation/Conviction Integrity Units ("SIU/CIU"). The firm's findings/conclusions determined that Krasner's  SIUCIU "misled the Court" resulting in a convicted murderer going free. This same law department, with this information, paid the convicted murderer over two million dollars of taxpayer dollars to settled a lawsuit brought by the convicted murderer. The report also determined the now Chief of the Conviction Integrity Unit, Michael Garmisa, was instrumental and knowledgeable in the "intentional deception" of the Court. This is the criminality and corruption Jacobs was/is exposing as a "Whistleblower" that cost him his employment with the "City of Philadelphia."

## C.    The District Court erred in granting the defendants' summary judgment for First Amendment Retaliation

To prevail on a First Amendment Retaliation claim under 42 U.S.C. § 1983 a plaintiff must prove that (1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action. *Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019)*. The plaintiff must demonstrate (1) that the conduct at issue was committed by a person acting under the color of state law and (2) the complained-of conduct deprived the plaintiff of rights secured under the Constitution or federal law. *Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)*. Although the Court indicated the plaintiff's claim mirrors another case (which it does not); the plaintiff's claims actually mirrors a recent Third Circuit Court of Appeals decision. *See Javitz v. Luzerne County (3rd Cir. 2019)*. Like Javitz, after reporting a crime Jacobs' relationship with his employer (City of Philadelphia) became rocky and he was subsequently "constructively discharged." Like Javitz, Jacobs reported his concerns and the DAO crimes to his supervisor Hendershot. Like Javitz, Jacobs asked his superior Wilson to refer the DAO's crimes against him to US Attorney William McSwain. Like Javitz, Krasner intervened and instructed Wilson not to refer the matter to the US Attorney (due to public and political disputes and criticisms with United States Attorney William McSwain), which the defendants deny. Like Javitz, after the meeting with Wilson, Jacobs followed up with Hendershot about the status of the referral to the US Attorney multiple times. Like Javitz, Jacobs alleges after making the report, the City of Philadelphia ("City") retaliated against him. Like Javitz, finally on March 12, 2021, Jacobs was constructively discharged. Like Javitz, the District Court granted the defendants' motion for summary judgment. "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee rather than citizen speech." *Lane v. Franks 573 U.S. 228 (2014)*. In *Dougherty v. School District of Philadelphia 772, F.3d 979 (3rd Cir. 2014)*, the Court found that "whether an employee's speech concerns the subject matter of his employment is non-dispositive" *(citing Garcetti 547 U.S. at 421)*. Like Javitz, Jacobs' speech was not within his ordinary job duties. Lastly, Like Javitz, "[Jacobs'] Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is subject of legitimate news interest; that is, a subject of general interest and value and concern to the public." *Lane, 573 U.S. at 241; see also Connick v. Myers, 461 U.S. 138, 146 (1983)*. "An internal investigation into the alleged criminal actions of public employees falls squarely within the core public speech delineated in *Connick*." *Baldassare v. State of N.J., 250 F.3d 188, 196-97 (3rd Cir. 2001)*. Here you have three defendants known to have credibility concerns and have authored **fabricated**

**documents** and made public statements to millions known to be false (App). That's in stark contrast to a highly decorated Law Enforcement Officer without credibility issues. Tripp observed Jacobs in the presence of a "known" FOP attorney on the same date as the Pownall bypass hearing. Jacobs is a member of the FOP. Tripp realizing Jacobs' concerns regarding the illegal arrest of Pownall contacted Hendershot in an attempt to violate Jacobs' Six Amendment right to counsel and to obtain privilege communications, if any. Hendershot contacted Jacobs and informed him of Tripp's threats. Jacobs' informed Hendershot Tripp is a criminal and there is no need to threaten the other members of OISI. Approximately three weeks later Jacobs' learned the DAO had fabricated/concocted a grand jury leak story in the Pownall matter (Note: Jacobs did not participate in the Pownall Grand Jury, other than being sworn in). The DAO then initiated a criminal proceeding and threatened Jacobs with arrest **unless he remained silent** (Tripp also threatened Jacobs' partner, Detective William Sierra). The threats were in violation of Jacobs' First Amendment rights for attempting to report corruption and criminal activity. Jacobs' attorney (Greg Pagano) informed Jacobs the DAO just wanted him to remain silenced until after the Pownall trial. For almost a year (August 1, 2019) Jacobs remained silent until the threat of arrest was lifted by the DAO. On October 4, 2019, Jacobs filed this complaint pro se. On that same date Jacobs authored a direct memorandum to Coulter asking for "Whistleblower" protections. After serving the defendants on October 17, 2019, the defendants, once again, attempted to gain information from Jacobs through surreptitious means. The defendants (Krasner and Tripp) had Philadelphia Inquirer reporter Chris Palmer, a known Krasner associate, contact Jacobs in an effort to acquire information regarding the complaint. On November 18, 2019, after returning from funeral leave, Hendershot contacted Jacobs and informed him he was confiscating his police vehicle. Jacobs later learned Hendershot had also shut down his mobile communications. When Jacobs informed Hendershot this action was a result of his federal complaint, Hendershot refrained from confiscating the vehicle. The retaliation was the result of an article published on BigTrial.net and authored by Krasner critic and nemesis Ralph Cipriano on November 18, 2019. A week later, on November 26, 2019, the plaintiff was summoned to Wilson's office by Hendershot. Wilson informed the plaintiff he could not meet with Coulter and told the plaintiff to reach out to Attorney General's Office ("AGO") to address the "victimization" by the DAO. The plaintiff informed Wilson there was a conflict of interest with the AGO because of their determination there was no probable cause to arrest Pownall. The plaintiff asked Wilson to refer the investigation to the United States Attorney William McSwain. Wilson asked the plaintiff to first confirm with the AGO before he referred the matter to the US Attorney. The plaintiff told Wilson when Krasner

complains about police they get disciplined but the PPD does not reciprocate. The plaintiff and Wilson also discussed the Cipriano article. The plaintiff informed Wilson Cipriano was not the only media outlet that has contacted the plaintiff, including Chris Palmer who had contacted the plaintiff again on November 19, 2019. Wilson informed the plaintiff he did not have a problem with the plaintiff speaking to media regarding his complaint. The only request by Wilson was to contact the AGO. Jacobs contacted the AGO the very next day and was told there was a conflict of interest. Jacobs contacted Hendershot and asked him to relay this information to Wilson so he could refer the matter to the US Attorney. Jacobs asked Hendershot everyday (excluding Hendershot's absence because of the death of his mother) if Wilson had referred this matter to the US Attorney. Each and every time Hendershot informed Jacobs he had not heard back from Wilson. On Saturday, January 18, 2020 Jacobs participated in a podcast discussing his complaint against the DAO. Hendershot immediately hears from Wilson. So the District Court's statement the plaintiff did not follow the instructions and/or advice of Deputy Police Commissioner Dennis Wilson prior to participating in the podcast is patently false as the record reflects that is clearly a bias determination. The defendants' total disdain for the plaintiff's Constitution Rights is shown by clear causal connections between protected activities and retaliatory conduct (1) September 27, 2018 Tripp observes the plaintiff in the presence of FOP counsel. September 27, 2018 Tripp threatens criminal prosecution. (2) October 17, 2019 Krasner and Tripp are served with complaint. October 18, 2019 Krasner and Tripp have Chris Palmer from Philadelphia Inquirer contact the plaintiff to surreptitiously obtain information. (3) November 18, 2019 Ralph Cipriano from BigTrial.net authors an article regarding the plaintiff's allegations against DAO. November 18, 2019 Hendershot threatens to take the plaintiff's police vehicle and shuts down his mobile communications. (4) January 18, 2020 the plaintiff participates in a podcast discussing his litigation. On January 21, 2021 the defendants initiated a disciplinary investigation. On April 21, 2021 Philadelphia Weekly Magazine authors an article regarding the plaintiff's corruption allegations. (5) On April 21, 2021 The PPD initiated an internal criminal investigation into the plaintiff to illegally obtain electronic communications (cell phone data, emails). These are the facts in the record that present a "genuine material dispute," not the fictional short story presented in the District Court's Memorandum, which claimed to have viewed these facts in the "light most favorable" to the plaintiff. Based upon the above listed facts the District Court's granting summary judgment in favor of the defendants should be vacated. The plaintiff's motion for summary judgment should be granted. In view of the standard at summary judgment, that means that an employer, to prevail on causation, "**must present evidence of such quality** that no reasonable juror could

conclude that the protected activity was the but-for cause of the termination." Hill v. City of Scranton, 411 F.3d 118, 126 n.11 (3d Cir. 2005).

## D.    The District Court erred in dismissing the plaintiff's Conspiracy Claim

**The above listed facts in the preceding paragraphs are incorporated as if fully set herein.**

The defendants acted in concert to deprive the plaintiff of a right protected by the United States Constitution. Based upon the facts the District Court erred in denying the plaintiff's claim of conspiracy.

## E.    The District Court erred in dismissing the claims against Defendant City of Philadelphia.

**The above listed facts are facts in the preceding paragraphs are incorporated as if fully set herein.**

A defendant in a federal civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). It is clear that Philadelphia District Attorney Lawrence (Larry) Krasner had knowledge and acquiescence of the criminal activity that was being perpetrated against the plaintiff *(App'x 410)*. The only dispute was his level of participation, which from all accounts was intimate and total participation. The City of Philadelphia was erroneously removed as a defendant when the District Court erred in dismissing the plaintiff's PA Whistleblower claims on October 20, 2022.

## F.    The District Court erred by denying the plaintiff's numerous requests for recusal under 28 U.S.C. § 455

**The above listed facts are facts in the preceding paragraphs are incorporated as if fully set herein.**

**ANY justice, judge, or magistrate of the United States shall disqualify himself in ANY proceeding in which his impartiality might reasonably be questioned.**

The impartiality and neutrality of judges is an indispensable feature of the American justice system. An impartial judiciary is imperative to ensure procedural fairness to individual litigants and to preserve public confidence in the integrity of the judicial process. Realizing these objectives requires that judges be neutral and unbiased in fact. "Preserving public confidence, however, additionally requires that judges present an appearance of scrupulous impartiality even in the absence of any actual bias." For the judiciary to maintain its authority in the public eye, "justice must satisfy the appearance of justice," at all times.

Probably the most important factor in this third appeal is the actions of the District Court throughout this process. After the second remand from this Court, Jacobs, a decorated law enforcement officer of twenty-five years, learned the District Court was intentionally manipulating the facts and proceedings in favor of the defendants in this matter. Here are some of the instances of bias and abuses of discretion by the District Court in favor of the defendants.

1.    First and foremost. There have been approximately **190 filings** in this matter. **The District Court has DENIED every motion filed by the pro se plaintiff. The District Court has GRANTED every motion filed by the defendants**, including two dispositive motions to dismiss the plaintiff's claims and the plaintiff's PA Whistleblower Law claim. The District Court often denied the plaintiff's claims without opposition from the defendants, including the plaintiff's request for injunctive relief in contrast with Third Circuit precedent. The District Court did not provide the pro se plaintiff a motive for denying the injunctive relief but clearly it did not apply the four factor test outlined in *Del. River Port Auth v. Transamerica Trailer Transport, Inc (1994).* which states (1) a reasonable probability of eventual success (2) that it would be irreparably injured without relief (3) the possibility of harm to other interested persons from the grant or denial of the injunction (4) public interest. On January 25, 2021, the District Court altered the plaintiff's filings, including applying the plaintiff's motion for injunctive relief against the PPD defendants (*ECF 25*). On that same date and without an opposing filing in any manner from the defendants, the District Court denied the plaintiff's request for injunctive relief (*ECF 26*). This Court has viewed denial of injunctive relief as an abuse of discretion. It is impossible for the District Court to analyze the first two factors without an opposing motion from the defendants, unless the District Court had a predetermined bias outcome in this matter.

2.    During the pre trial conference the District Court called security on the 25 year decorated Detective without any provocation. The next day the plaintiff authored a letter to the District Court outlining what he believed was a

offensive/discriminatory conduct by the District Court (*App'x 411*). The District Court did not respond to the decorated Detective's letter. Approximately six months later the pro se plaintiff attached the previous letter to the District Court requesting recusal (*ECF 95-1*). Only then, after the letter was placed in the record, did the District Court acknowledge the decorated Detective's claims in denying the motion for recusal (*ECF 97*). The District Court indicated he always summoned security for a pro se plaintiff. So if Jacobs (black male) hired a 5'0, 100lb white female attorney the District Court would have felt safe and not summoned security. Right. If that fact was true, the District Court could have addressed the decorated Detective's concerns and afforded him the "courtesy" and immediately relayed that fact to the decorated Detective when Jacobs informed the District Court of the perceived offensive/discriminatory conduct the very next day. Not after Jacobs placed the letter in the record requesting recusal. The District Court also denied instructing Jacobs' former counsel to "officially" withdraw. The record does not support that denial from the District Court (*ECF 30 at 11*) who made counsel "aware" of the additional motion to withdraw.

3.    The District Court issued Orders and inserted patently false information into the record in favor of the defendants (*ECF 132 at footnote 1*). The plaintiff issued a subpoena to Asa Khalif. Tripp stated during her deposition she did not know Khalif. On September 1, 2018 Khalif posted the pending arrest of Pownall prior to Tripp and Krasner's Presentment on September 4, 2018 (*ECF 14 pg 42*). In November 2017 Khalif was arrested attempting to confront SDAG Christopher Phillips after his meeting with Terrance Freeman. The District Court termed Khalif "unaffiliated" with the DAO and quashed the subpoena issued to Khalif. At the time of the quash Khalif was introduced by Krasner as the DAO's LGBTQ liaison (*App'x 412*). How did the District Court determine Khalif was "unaffiliated."

4.    The District Court denied the plaintiff's requests compelling discovery under FRCP 37(a)(C)(4). On October 4, 2019 Jacobs sent a direct and discreet email to Coulter requesting whistleblower protections. After not receiving a response Jacobs resent the email on October 6, 2019. After not receiving a response Jacobs sent a memorandum through the chain of command requesting protections on November 8, 2019. During a deposition of Coulter on April 28, 2022, Jacobs learned Coulter immediately obtained information from City Solicitor Marcel Pratt and forwarded the information to Wilson the same week she received the first email. Coulter ordered Wilson to forward the information received from Pratt to Jacobs. Coulter indicated by the time she received the October 6, 2019 email she already spoke to Wilson. Wilson lied and informed Coulter he had spoken with Jacobs (*App'x 418 at pg 41*). Coulter also testified she has never known Jacobs to

"violate departmental policy and disparaged the department" (*App'x 428 at pg 86-87*). Coulter also testified that Wilson violated departmental policy by not forwarding correspondence by Jacobs (*App'x 419 at pg 47-48*). Finally, Coulter testified that Wilson never informed her of the disciplinary action taken against Jacobs and he definitely should have and she cannot think of reason he did not inform her (*App'x 423, 425 at 66, 425*). During a deposition of Wilson on April 4, 2022 Wilson admitted he lied to millions of Philadelphia and United States citizens during a press conference with the Mayor and Philadelphia Police Commissioner Danielle Outlaw ("Outlaw"). Wilson allowed DF Pace to initiate and enforce fabricated disciplinary charges and Krasner's DAO to arrest former SWAT police officer Richard Nicolletti for not violating any departmental policy and not committing any crime (*App'x 433-434*). DF Pace ("Pace") approved numerous fabricated retaliatory disciplinary investigations against police personnel. Some of Pace's targets were Jacobs, Sergeant Christina Mellett, Inspector Joseph Bologna, and SWAT Officer Richard Nicolletti. After Jacobs and Mellett filed lawsuits naming Pace as a defendant he became worried about losing his law license. Pace confronted Deputy Commissioner Benjamin Naish about being forced to "sign his name" to the fabricated and retaliatory documents. Naish replied "you work for me." Naish immediately transferred Pace to the disciplinary assignment of "night command." Pace subsequently sold his home and left the Philadelphia Police Department. Pace was reinstated to the PPD when Frank Vanore became Deputy Commissioner. Hendershot falsified an arrest affidavit and warrant to arrest Pownall in August 2018 (*App'x 435-438*). After charges were dismissed against Pownall, Hendershot authored an "affidavit of facts" stating there was never probable cause to arrest Pownall (*App'x 439-446*) Hendershot falsified a search warrant affidavit in the highly publicized Walter Wallace OIS. Hendershot conspired and acted in concert with fabricated and retaliatory disciplinary action against Jacobs. When Jacobs attempted to address defendants' illegal/retaliatory actions and credibility, the District Court violated the FRCP and issued sanctions against Jacobs by not allowing obtain discovery and asked any questions of any defendant questioning their credibility and/or illegal actions regarding Pownall, and any disciplinary action taken against Jacobs after February 2020 (*ECF 154*).

5. The District Court denied the plaintiff leave to amend consistent with the FRCP. The District Court has repeatedly denied the plaintiff's multiple requests for leave to amend. In doing so, the District Court has stated their "generosity" to the pro se plaintiff. The plaintiff has "personally amended" his complaint twice (Doc. #3 and #27). All other "amendments" were "directed" by the District Court's actions which confused the seasoned lawyers representing the defendants, who requested "clarity." *FRCP Rule 15(a)(1) Amending as a*

*Matter of Course. A party may amend its pleading once as a matter of course (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or **21 days after service of a motion under Rule 12(b),** (e), or (f), whichever is earlier. (2) Other Amendments. In all other cases, a party may amend its pleading...the court's leave. The court should freely give leave when justice so requires.* The District Court threatened the pro se litigant with sanctions, including dismissal, if he filed any additional amendments after the second remand from this Court. After the second remand the pro se plaintiff realized the importance of the record after he observed intentional fabrications inserted by the District Court, which this Court, accordingly/unfortunately, had to rely on. The defendants filed a 12(b)(6) motion to dismiss (Doc. #33) and the District Court denied the pro se plaintiff the opportunity to amend as a matter of course (Doc. #34) and in the interest of justice. As a result the District Court erred and made the plaintiff's clearly labeled motion to dismiss response (Doc. #29) the deficient operative pleading. After the second remand the pro se plaintiff learned of several items considered "new evidence" after extensive due diligence. The "new evidence" uncovered by the plaintiff included the illegal surveillance of his electronic devices (emails, cell phones, etc.) by the PPD after an article in Philadelphia Weekly outlining the DAO corruption. The article was dated April 21, 2021. The illegal surveillance started the same day. The District Court denied leave to amend. The defendants' counsel stated "file another lawsuit" (*App'x 357* ). Jacobs also learned the DAO targeted him because of his race. The District Court denied multiple requests from Jacobs requesting leave to amend.

6.    The District Court allowed the defendants to withhold fabricated documents they presented to the plaintiff during a deposition by claiming privilege. During the plaintiff's deposition by the defendants on August 15, 2023 they produced the alleged "lost transcripts" (*App'x 38 at 141*). The defendants also presented an "intentionally" fabricated document, which the "artist" failed to make all of the necessary "alterations." When the plaintiff called out the defendants' nefarious activity they stop showing the documents. The plaintiff requested the "discoverable" documents and the defendants claimed privilege, which the **District Court erred and granted**. First, you cannot claim privilege on a fabricated document not presented to any grand jury. Second, the defendants cannot claim privilege on documents used in the "investigative" grand jury that the plaintiff was sworn into and allowed to view all said documents. *234 Pa. Code Rule 556.10. Secrecy; Disclosure (A)(1) All evidence, including exhibits and all testimony presented to the grand jury, is subject to grand jury secrecy, and no person may disclose any matter occurring before the grand jury, except as provided in*

*paragraph (B). 234 Pa. Code Rule 556.10. Secrecy; Disclosure Rule (B)(4)(a)*
*Other Disclosures: Disclosure of grand jury material or matters, other than the*
*grand jury's deliberations and the vote of individual jurors, may be made to any*
***"law enforcement personnel"** that an attorney for the Commonwealth considers*
*necessary to **"assist in the enforcement of the criminal law."*** The plaintiff was
sworn into the investigative grand jury as "law enforcement personnel." There has
not been an order revoking this fact. As such, the plaintiff is allowed to view the
investigative grand jury materials, including the fabricated documents. The
defendants' reluctance and the District Court capitulation is only a shield from
exposing the corruption and criminality which is the basis of the pro se plaintiff's
claims.

7.     The District Court denied the plaintiff the opportunity to depose members of
the PPD who was/is conducting an illegal electronic surveillance of the plaintiff
through a fabricated criminal investigation as a result of a Philadelphia Weekly
article on April 21, 2021. On July 11, 2023, the plaintiff filed an Internal Affairs
Complaint against Hendershot for intentionally filing a false arrest affidavit to
arrest Pownall (W-IAD-23-2482). On July 12, 2023 Corporal Sanchez from
Internal Affairs emailed the plaintiff indicating this matter is "already being
investigated" under IAD #21-1521. Jacobs immediately contacted Corporal
Sanchez and informed him he did not file complaint #21-1521. Sanchez (who was
recently assigned to IAD) stated the investigation was being handled by the
criminal division and Captain Charles Vogt's team had the investigation and
Lieutenant Morton was in charged but was on vacation. Jacobs contacted Morton
who informed Jacobs the investigation was initiated against Jacobs as a result of a
Philadelphia Weekly article on April 21, 2021 addressing Jacobs' lawsuit and
corruption at the DAO. Jacobs asked Morton who initiated the complaint and he
would not respond but inquired into Jacobs' federal litigation. Jacobs asked when
was the complaint initiated and Morton replied the same date as the article (April
21, 2021). Jacobs issued subpoenas multiple parties, including Krasner, Outlaw,
Khalif, Morton. On September 8, 2023, City Solicitor Nicole Morris filed a motion
to quash Krasner and Outlaw's subpoenas. Morris acknowledges she is
"undersigned counsel" for the defendant, City of Philadelphia. Three days later, the
District Court issued a memorandum indicating subpoenas served to Morris as
agreed upon during the Rule 16(f) conference with Morris was now not properly
served and the defendants did not have to respond under Rule 45. This was a circus
trick the rivaled Ringling Bros. This was after Morris responded to subpoenas by
filing a motion to quash (*ECF 131*). The District Court then made the patently false
statement that Asa Khalif appears to be "unaffiliated" with the DAO (*ECF 132*).

8.    The District Court and the defendants in violating the plaintiff's Six Amendment right to counsel attempted to infer Jacobs admitted guilt by not revealing the contents of his consultation with counsel. The District Court in total violation of Jacobs's six amendment right to counsel authored the following in its memorandum to justify its bias. "In his own deposition, Jacobs "conceded" that he spoke with Perri when he stated "no one else knows what I said to Fred Perri. I do." So the District Court in cherry-picking from Jacobs' deposition testimony (*which, by the way, lasted for almost twelve (12) hours over two days without a lawyer, pad, pen, or objection*) found a few words, out of thousands, but intentionally did not offer the entire statement. Here is the "complete" statement from Jacobs: *Show me a document. Show me a statement to this day you, her, or **no one else knows what I said to Fred Perri. I do.** I'm not going to tell you because I know that's BS too because she made it up Everything she did, she made up just like she illegally arrested Pownall. She made that up too (App'x 447)*. So why would the District Court just pick out that one line to justify its bias when so much more was said. Unfortunately, it's because as in so many times in these filings it has intentionally abused its discretion it favor of defendants. So since Jacobs did not divulge the nature of his conversation the District Court violated that Constitutional Right and made the leap to an implied admission of guilt. The District Court goes further when it made a statement in the record that is totally devoid of any facts and is blatant lie. The District Court authored the following *"Jacobs did not engage in constitutionally protected speech when he "revealed" grand jury information to Perri. He also did not engage in constitutionally protected speech when he revealed confidential information on the podcast."* Those statements by the District Court defamed Jacobs as a former officer of the court and citizen. Those statements violated the judicial Canons by intentionally placing LIES into the record. There are not any "facts" in the record to support Jacobs revealing grand jury information or confidential information. On the contrary the "FACTS" in the record indicate Jacobs did not! *Q. ...In Jacobs's disciplinary documents you stated that he divulged staffing levels. What staffing levels that was not publicly available did Jacobs divulge? A. Staffing levels of the Officer-Involved Shooting Investigations Unit. Q. Was those staffing levels already available to the public? A. I have no idea. I don't believe so. **Q. Did you check? A. No, I did not.**(App'x 344 at 18-24 and 345 at 1-4) Lieutenant Hendershot, you stated that the staffing levels were not in the public domain; is that correct? A. That's my belief. Q. But yet on a belief you charged Detective Jacobs; is that correct? A. Yes. Q. And you also don't know whether or not that information is publicly available, do you? A. I thought it was confidential. I just didn't know. **I guess I was wrong.** Q. Oh, you were wrong. Meanwhile, I sit here unemployed because you were wrong; is that correct?(App'x 363 at 5-11) OBJECTION.*

Furthermore, the staffing levels were public information *(App'x 369-373)* That's the record for confidential information. Now let discuss the grand jury. *Q. Did you inform Deputy Commissioner Wilson at that time that Detective Jacobs did not commit a grand jury leak violation?...Q. The question was, did you inform Deputy Commissioner Wilson that Tracy Tripp -- what Tracy Tripp was alleging did not happen? That the Plaintiff **did not leak** grand jury information? A. I did inform him of that in my opinion. (App'x 387 at 22-24 and 389 at 17-21)* There's more *Q. Did you contact anyone when you learned that the plaintiff was being targeted by Tracy Tripp (Hendershot Deposition Page 129, lines 13-24)? A. ...Inspector Naish was not in my direct chain of command; however, he was an inspector in the detective bureau. With that said I had a direct report to Chief Inspector Vanore. ...so they were "aware" of what was going on in addition to Deputy Commissioner Wilson (Hendershot Deposition Page 130, lines 6-17). Q. "But you knew that what she was alleging wasn't true; is that correct? A. Yes" (App'x 396) (Hendershot Deposition Page 137, lines 4-6). Q. ...I also called Tracy Tripp and Larry Krasner during that phone call criminals, didn't I? A. I don't remember your exact words. Knowing you, you probably did. Q. If I called them criminals in 2018 and you just said knowing me, being upfront like I am, why would 2020 be any different with me calling them criminals when **I've been telling you they were criminals for two years?** (App'x 392)* MR. GONZALES: Objection. Besides the District Court being factually inaccurate, these are definitely, to put it mildly, genuine disputes of material facts. The District Court also intentionally and falsely indicated in the record that "Jacobs went outside the chain of command." It's impossible to get so many facts wrong if the District Court "VIEWED" them in the light most favorable of the nonmoving party. The record showed Jacobs stayed within the "chain of command." The record showed Jacobs followed every order. The record shows the defendants created an unbearable and hostile environment against for becoming a "whistleblower," which now all allegations by Jacobs have been proven true *(Note: Police Officer Ryan Pownall has passed all requirements and will be reinstated to the Philadelphia Police Department and made whole).*

9.    It is well established that a court is obliged to give the party opposing summary judgment an adequate opportunity to obtain discovery. *Shelton v. Bledsoe, 775 F.3d 554, 565 (3d Cir. 2015).* The District Court repeatedly denied the plaintiff the opportunity to obtain discovery including fabricated documents. The Defendants violated the FRCP on multiple occasions forcing the pro se plaintiff to begin depositions by citing EDPA Hall v. Clifton Precision. The defendants continued to violate the FRCP and adjourned multiple depositions being conducted by the plaintiff. *(App'x 213-217).* These were intentional abuses by the defendants by abusing taxpayer funds. The defendants and District Court

realize the pro se plaintiff is operating on limited funding not taxpayer funding. The District Court's failure to issue sanctions and compel discovery from the defendants exercised an abuse of discretion by the District Court.

**G.     The District Court erred in its analysis and the granting of Tracy Tripp immunity defenses**

The above listed facts are facts in the preceding paragraphs are incorporated as if fully set herein.

The Commonwealth of Pennsylvania has "investigating grand juries" not indicting grand juries. As such, the prosecutors as well as the law enforcement personnel that are sworn it act as investigators not prosecutors. It is only after "honest" evidence is presented to the grand jury that it is then presented for an indictment. No different than a detective/affiant swearing out facts seeking a warrant. If the detective/affiant submits fabricated evidence in seeking the warrant he/she is subject to civil/criminal penalties. Tripp was not acting as an advocate in the Pownall or any other Commonwealth investigating grand jury she participated in. As such, she was acting as an "investigator." The District Court erred by indicating she is entitled to absolute immunity if she violated Jacobs' constitutional rights. This fact is confirmed by the Chief of the Philadelphia District Attorney's Office Special Investigations Unit ("DAOSIU"), Lyandra Retacco ("Retacco"). Retacco testified in front of the Honorable Judge Barbara McDermott representing Tripp's "practices" in the Pownall grand jury "investigation." Retacco testimony stated the following: *"the investigating grand jury was a "fact-finding" vehicle. It is the functional equivalent of the investigation that a detective would do when they are creating the affidavit of probable cause and then submitting it into the District Attorney's office to then convert into a criminal complaint and submit to a judge for signing for whether or not there's probable cause for an arrest warrant."* This concession by the defendants precludes absolute immunity. The District Court erred and abused its discretion by indicating the plaintiff suffered no depravity of his constitution rights under Saucier. The defendants' actions are no different at this stage than a "dirty cop" planting evidence on innocent individuals. ("We conclude that the constitutional rule that "framing criminal defendants through use of fabricated evidence, including false or perjured testimony, violates their constitutional rights applies with such obvious clarity that it is unreasonable for us to conclude anything other than that the detectives (Krasner and Tripp) were on sufficient notice that their fabrication of evidence violated clearly established law.");" Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017).

## 2. THE DISTRICT COURT ERRED IN DISMISSING THE PLAINTIFF'S PENNSYLVANIA WHISTLEBLOWER CLAIM AND IN THE PROCESS ERRED IN DISMISSING THE CITY OF PHILADELPHIA AS A DEFENDANT

*PENNSYLVANIA WHISTLEBLOWER LAW Act of Dec. 12, 1986, P.L. 1559, No. 169*

### Section 2. Definitions:

**"Appropriate authority."** A Federal, State or local government body, agency or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency or organization. The term includes, but is not limited to, the Office of Inspector General, the Office of Attorney General, the Department of the Auditor General, the Treasury Department, the General Assembly and committees of the General Assembly having the power and duty to investigate criminal law enforcement, regulatory violations, professional conduct or ethics, or waste.

**"Employee."** A person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for an employer.

**"Employer."** A public body

**"Public body."** A City

**"Whistleblower."** A person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority.

### Section 3. Protection of employees:

(a)     Persons not to be discharged. No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

(b)     Discrimination prohibited

(c)     Disclosure prohibition. An appropriate authority to which a violation of this act was reported may not disclose the identity of a whistleblower without the whistleblower's consent unless disclosure is unavoidable in the investigation of the alleged violation.

### Section 4. Remedies:

(a)     Civil action. A person who alleges a violation of this act may bring a civil action in a court of competent jurisdiction for appropriate injunctive relief or damages, or both, within 180 days after the occurrence of the alleged violation.

(b)     Necessary showing of evidence. An employee alleging a violation of this act must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority.

## Section 5. Enforcement:

A court, in rendering a judgment in an action brought under this act, shall order, as the court considers appropriate, reinstatement of the employee, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages or any combination of these remedies. A court shall also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the complainant prevails in the civil action.

## Section 6. Penalties:

A person who, under color of an employer's authority, violates this act shall be liable for a civil fine of not more than $10,000. Additionally, except where the person holds an elected public office, "if the court specifically finds that the person, while in the employment of the Commonwealth or a political subdivision, committed a violation of this act with the intent to discourage the disclosure of criminal activity," the court may order the person's suspension from public service for not more than seven years.

Prior to September 27, 2018, the plaintiff learned of criminal actions being committed by the DAO headed by Philadelphia District Attorney Lawrence Krasner. At least three of the criminal actions targeted and/or involved the plaintiff. The most notable and most publicized was the Officer Involved Shooting ("OIS") involving former Philadelphia Police Officer Ryan Pownall ("Pownall").

(1)     On June 8, 2017 Pownall was involved in an OIS the led to the death of David Jones. Krasner immediately obtained the information of the adult male witness, Terrance Freeman ("Freeman"), and provided it to members of Black Lives Matter ("BLM") Asa Khalif ("Khalif"), Issac Gardner ("Gardner"), and Christopher Norris ("Norris"). All of whom were pictured with Krasner following his inauguration *(App'x 432)*. On June 20, 2017 Norris contacted OISI specifically asking to speak with Jacobs claiming to be a witness. When Jacobs spoke with Norris he initially lied and said he received Jacobs' information from former Police

Commissioner Richard Ross. When Jacobs confronted Norris, he admitted he received Jacobs' information from Terrance Freeman whose information he received from Krasner. Norris authored an article on June 26, 2017 outlining Krasner's future plans for Pownall Eyewitness to Police Shooting of Dirt-Bike Rider Disputes Official Account - Philadelphia Magazine (phillymag.com). Due to an indictment of former Philadelphia District Attorney Seth Williams and a conflict of interest with the DAO the Pownall OIS was being handled by the Pennsylvania Attorney General's Office ("AGO"). After a November 3, 2017 meeting with Senior Deputy Attorney General Christopher Phillips ("Phillips") and Freeman Phillips informed Jacobs Pownall would not be charged as a result of the OIS. A few days later Khalif and Gardner, agents of Krasner, stormed the AGO demanding Phillips. Khalif (Earl Pittman) was ultimately arrested. In January 2018 after his inauguration Krasner retrieved the Pownall OIS from the AGO prior to their announcement of no charges. The arrest of Pownall was a premeditated crime by Krasner. On September 4, 2018 Krasner and Tripp announced Murder Charges against Pownall. After viewing the Presentment used to charge Pownall it was obvious to Jacobs the DAO coerced the witness into perjury and withheld exculpatory evidence from the investigating grand jury.

(2)   On January 13, 2018 Stefon Crawley ("Crawley") attempted to kill multiple Police Officers in the area of 2800 Kensington Avenue. The case was assigned to Jacobs. Witness accounts and evidence confirmed this fact as well as Crawley's DNA being on one Officer's firearm while he was attempting to steal the Officer's firearm and kill the Officers with it. Crawley was shot during this incident and transported to an area hospital for treatment. Crawley was represented by Krasner's former law partner/firm. A meeting in Judge Charles Erlich's Chambers was held with Tracy Tripp, Brian Collins ("Collins"), and ADA Kathleen Lewis ("Lewis"), to discuss dismissing the charges against Crawley. After the meeting Lewis informed onlookers she could no longer discuss the Crawley matter without an attorney. *Note: Other than Lewis informing the plaintiff she was not affiliated with the Special Investigations Unit of the DAO, the plaintiff was never contacted by the DAO regarding Crawley.* After almost 3-1/2 years the DAO cleared the Officers to testify because Crawley who was being represented by Krasner's former law partner/firm sued the City for hundreds of thousands of dollars. Crawley and Krasner's former law firm profited from Crawley attempting to kill multiple police officers.

(3)   Maurice Phillips ("Maurice") killed his four year old daughter by shooting her in the head while playing with a handgun. The case was assigned to the plaintiff's partner, Detective Sierra. After the shooting Maurice wiped his deceased

four year old daughter's blood on the clothing his five year old daughter was wearing. Maurice then assaulted his five year old daughter, blaming her for the shooting. He then told his oldest child to tell police the five year old shot the four year old. After placing the four year old in another room, Maurice fled the location. The plaintiff and Sierra investigated the murder. Maurice eventually confessed to the murder. In an effort to smear the plaintiff and Sierra, Krasner initiated a chain of events to have Maurice recant his confession and proclaim it was coerced by the plaintiff and Sierra. Then DAO Chief of Homicide Anthony Voci informed Krasner the case against Maurice was, unfortunately, air tight. This is exactly how Krasner has released convicted murderers. He solicits and obtains coordinated recants from convicted murders. Krasner then informs the Court of "new evidence" by smearing the police. Knowing he will never conduct a new trial he then "exonerates" the convicted murderer for profit. These are literally "prison breaks for profit." That is exactly what he planned for a careless father who blew his four year old daughter's brains out in an effort to target his rivals, Law Enforcement Officers. The current Chief of the DAO Conviction Integrity Unit, Michael Garmisa ("Garmisa") confirms this very fact. Garmisa confirms in depositions there is no new evidence or investigations just a "Murderers for Millions" scheme by Krasner. Deputy Chief City Solicitor, Danielle Walsh, also confirms this fact.

The District Court and the defendants indicate the reason Jacobs was not prosecuted was because of lost transcripts on September 27, 2018 and November 9, 2018. *(App'x 10-11)* The defendants produced the lost transcripts while deposing the plaintiff. The plaintiff replied "I was told the transcripts were lost." (*App'x 38*) When the plaintiff informed the District Court of the transcripts and fabricated documents during the deposition the defendants claimed the "fabricated documents are privileged." This confirmed the defendants retaliated against the plaintiff for being a whistleblower. The "lost transcript" was a lie as Jacobs have claimed from the beginning. This was a "hit" ordered by Krasner.

Krasner has done the following: (1) Illegally arrested sworn Law Enforcement Officers ("LEO") (2) Illegally released convicted murderers (3) Coerced Commonwealth's witnesses into fabricated testimony to illegally arrest LEO (4) Fabricated documents to release convicted murderers and arrest LEO.

Jacobs has clearly satisfied all of the elements of a "whistleblower" according to PA law. Jacobs clearly was retaliated against because he was/is a "whistleblower." There is clearly a causal connection between Jacobs becoming a "whistleblower" and the retaliatory conduct by the defendants.

(1) On September 27, 2018 Tripp observed Jacobs consulting with an FOP Attorney. On September 27, 2018 Tripp contacts Jacobs' superior (Hendershot) and attempts to ascertain the nature of the communications between Jacobs and the FOP Attorney by threatening the members of OISI with arrest. On September 27, 2018 Jacobs' superior Hendershot contacts Jacobs and informs him of Tripp's threats against OISI members. On September 27, 2018 Jacobs informs his superior Hendershot he was the OISI detective consulting with the FOP Attorney in an effort to expose the "corruption and criminality" of the DAO, Krasner, and Tripp.

(2) On or about October 16, 2018 Krasner, Tripp, and DAO concocted a fabricated story of a grand jury leak to *"maliciously prosecute"* (emphasis added) Jacobs and chill his speech. The DAO headed by Krasner then initiated a criminal proceeding against Jacobs and threatened Jacobs with prosecution unless he remained silent, chilling Jacobs' speech from reporting corruption at the DAO.

(3) On August 1, 2019 Tripp informed Jacobs the DAO headed by Krasner withdrew the criminal prosecution against Jacobs.

(4) On October 4, 2019 Jacobs initiated a § 1983 civil complaint against the DAO defendants including violations of the PA Whistleblower Law.

(5) On January 18, 2020 Jacobs participated in a podcast and discussed his § 1983 civil complaint against the DAO defendants. On January 21, 2020 the Philadelphia Police Department ("PPD") and defendants Wilson, Hendershot, and Pace initiated a departmental disciplinary investigation against Jacobs charging him with Conduct Unbecoming an Officer in reference to the podcast. *Note: Originally these defendants were charged in a separate new § 1983 civil complaint which the District Court merged with the DAO defendants.*

(6) The District Court erred and DISMISSED the plaintiff's claims as time barred against all defendants. The District Court also erred by not viewing the facts in the light most favorable to the pro se plaintiff.

Section 1983 has no statute of limitations of its own. *See 42 U.S.C. § 1983.* Rather, it borrows the underlying state's statute of limitations. *Wallace v. Kato, 549 U.S. 384, 387 (2007).* In Pennsylvania, a whistleblower claim is 180 days. A Section 1983 claim accrues is a matter of federal law. *Wallace 549 U.S. at 388.* Federal law holds that a malicious prosecution claim accrues when the criminal proceeding end in the plaintiff's favor. *Heck v. Humphrey, 512 U.S. 477, 489 (1994).* For Jacobs, that happened on August 1, 2019 when Tripp informed him she was withdrawing the criminal prosecution against him. The purpose of the favorable termination requirement is to avoid "the possibility of the claimant succeeding in the tort action

after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." *Heck v. Humphrey, 512 U.S. 477, 484 (1994).* A plaintiff may attempt to indicate his innocence by demonstrating that his prior criminal proceeding terminated in one of the following ways: "(a) a discharge by a magistrate at a preliminary hearing, or (b) the refusal of a grand jury to indict, or *(c) the formal abandonment of the "proceedings" by the public prosecutor,* or (d) the quashing of an indictment or information, or (e) an acquittal, or (f) a final order in favor of the accused by a trial or appellate court." *Donahue, 280 F.3d at 383.*

Third Circuit precedent recognized that a party's state of mind is not a proper issue for resolution on summary judgment," Young v. Quinlan, 960 F.3d 351, 360 (n.21) (quoting Wilson v. Seiter, 893 F.2d 861, 866 (6th Cir. 1990) because it is "inherently a question of fact which turns on credibility." Id. (citing Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1265 (5th Cir. 1991); Miller v. FDIC, 906 F.2d 972, 974 (4th Cir. 1990); Nat'l Fire Ins. Co. v. Turtur, 892 F.2d 199, 205 (2d Cir. 1989); 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1437 (6th Cir. 1987); 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2730 (1983 & 1991 Supp.)), superseded by statute on other grounds as stated in Ghana v. Holland, 226 F.3d 175, 184 (3d Cir. 2000). Qualified immunity does not shield a government official where she has "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012) (citations omitted). The defendants, all with factual and documented credibility issues precludes a resolution at the summary judgment stage. The District Court accepted the defendants' "beliefs" without any supporting evidence.

## CONCLUSION

The Court's memorandum supporting its decision to grant the defendants' motion for summary judgment is not supported by facts in the record. The Court has attempted to create a Rodin sculpture out of the defendants' fabricated pile of poop. Unlike Rodin, there is nothing to "think" about here. The defendants' retaliated against the plaintiff for reporting corruption. The District Court is bias and abused its discretion by granting the defendants' motion for summary judgment when there are "genuine disputed material facts" in the record that would prevent that decision. The District Court also erred by denying the plaintiff's motion for summary judgment as the facts presented by the plaintiff are uncontested, undisputed, and most of all TRUE!

# CERTIFICATE OF SERVICE

I, Derrick Jacobs, Plaintiff within the above-captioned matter, hereby certify that a true and correct copy, according to the Federal Rules of Appellate Procedure was sent via ECF/email upon the listed parties on the date shown below,

Date:  June 18, 2024

Derrick Jacobs,

Plaintiff

Pro se

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CIVIL COMPLAINT NUMBER: 19-CV-4616

**DERRICK JACOBS**
*Plaintiff*

V.

**CITY OF PHILADELPHIA, et al.**
*Defendants*

### PLAINTIFF DERRICK JACOBS' NOTICE OF APPEAL

Notice is hereby given that Plaintiff, Derrick Jacobs, in the above named case, hereby appeals to

the United States Court of Appeals for the Third Circuit from the March 21, 2024 JUDGMENT,

Document 188 (enclosed as Exhibit "A") against Plaintiff Derrick Jacobs.

Derrick Jacobs
Plaintiff
Pro Se
Date: April 15, 2024

## CERTIFICATE OF SERVICE

I, Derrick Jacobs, Plaintiff within the above-captioned matter, hereby certify that a true and correct copy, according to the Federal Rules of Civil Procedure was sent via ECF/email upon the listed parties on the date shown below,

Date:   April 15, 2024

Derrick Jacobs,
Plaintiff
Pro se

App 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS                        :          CIVIL ACTION
                                      :
              v.                      :
                                      :
CITY OF PHILADELPHIA, et al.          :          NO. 19-4616

JUDGMENT

AND NOW, this 21st day of March, 2024, for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that JUDGMENT is entered in favor of Defendants Tracy Tripp, Deputy Commissioner Dennis Wilson, Inspector DF Pace, and Lieutenant Jason Hendershot and against Plaintiff Derrick Jacobs.

BY THE COURT:

/s/ Harvey Bartle III
                                            J.

App 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS                    :        CIVIL ACTION
                                  :
          v.                      :
                                  :
CITY OF PHILADELPHIA, et al.      :        NO. 24-4616

ORDER

AND NOW, this 21st day of March, 2024, for the reasons
set forth in the foregoing Memorandum, it is hereby ORDERED
that:

(1)  the motion of Defendant Tracy Tripp for summary judgment
     (Doc. #169) is GRANTED;

(2)  the motion of Defendants Deputy Commissioner Dennis
     Wilson, Inspector DF Pace, and Lieutenant Jason
     Hendershot for summary judgment is GRANTED (Doc. #171);
     and

(3)  the motion of Plaintiff Derrick Jacobs for summary
     judgment (Doc. #173) is DENIED.

BY THE COURT:

/s/ Harvey Bartle III
                                   J.

**App 4**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS                    :        CIVIL ACTION
                                  :
          v.                      :
                                  :
CITY OF PHILADELPHIA, et al.      :        NO. 19-4616

MEMORANDUM

Bartle, J.                                 March 21, 2024

     Plaintiff Derrick Jacobs, a former Philadelphia Police
Detective proceeding pro se, has sued Defendants Philadelphia
Police Lieutenant Jason Hendershot, Deputy Philadelphia Police
Commissioner Dennis Wilson, and Philadelphia Police Inspector DF
Pace (the "Philadelphia Police Defendants") as well as Defendant
Tracy Tripp, a former Philadelphia Assistant District Attorney.
He alleges conspiracy to retaliate and retaliation under 42
U.S.C. § 1983 for violations of his First Amendment rights.
Before the court are the cross-motions of all Defendants and
Plaintiff for summary judgment.

                              I.

     Under Rule 56 of the Federal Rules of Civil Procedure,
summary judgment is appropriate "if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  A dispute is genuine if the evidence is such that a
reasonable factfinder could return a verdict for the nonmoving
party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254
(1986).  The court views the facts and draws all inferences in
favor of the nonmoving party.  See In re Flat Glass Antitrust
Litig., 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient
record evidence for a reasonable factfinder to find for the
nonmovant.  See Anderson, 477 U.S. at 252.  "The mere existence
of a scintilla of evidence in support of the [nonmoving party]'s
position will be insufficient; there must be evidence on which
the jury could reasonably find for [that party]."  Id.  In
addition, Rule 56(e)(2) provides that "[i]f a party fails to
properly support an assertion of fact or fails to properly
address another party's assertion of fact as required by
Rule 56(c), the court may . . . consider the fact undisputed for
the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II.

The court first considers Defendants' motions for
summary judgment on Plaintiff Jacobs's remaining Section 1983
claims.[1]  At this point the court views the undisputed facts in
the light most favorable to Jacobs.

_____

1.  Jacobs amended his complaint several times.  Defendants
requested clarification and this court determined that the

-2-   App 6

Jacobs at all times relevant was a detective with the Philadelphia Police Department, and as such, was an employee of the City of Philadelphia. He was assigned to the Officer Involved Shooting Investigation ("OISI") unit. OISI was comprised of six investigating officers including Jacobs and a commanding officer, Defendant Lieutenant Jason Hendershot.

On June 8, 2017, Philadelphia Police Officer Ryan Pownall shot a civilian while he was on duty. The shooting was investigated by the OISI unit. Jacobs participated in the investigation and among other tasks interviewed eyewitnesses, gathered evidence, and relayed his findings to prosecutors.

On the application of the Philadelphia District Attorney's Office, Judge Robert Coleman of the Court of Common Pleas of Philadelphia County convened a grand jury to investigate the Pownall shooting and to determine if criminal charges were appropriate (the "Pownall grand jury"). The case was prosecuted by Defendant Assistant District Attorney Tracy Tripp. In May 2018, OISI officers including Jacobs were brought before the Pownall grand jury and sworn to secrecy by Judge Coleman. On August 2, 2018, Tripp met with Jacobs to prepare him to testify before the Pownall grand jury. He was ultimately

---

operative complaint was a combination of his Fourth and Fifth Amended Complaints (Doc. #46). Jacobs was then denied leave to amend his complaint a sixth and seventh time (Docs. #59, #77).

never summoned to testify as a fact witness.  Jacobs states that he was the only OISI officer who did not testify as a fact witness.

On September 4, 2018, the grand jury returned a presentment that recommended bringing homicide charges against Pownall.  Jacobs reviewed the presentment and based on his involvement in the police investigation believed that it referenced inaccurate evidence.  In particular, he asserted that the presentment relied on statements from an eyewitness who Jacobs interviewed and who later recanted his observations. Jacobs maintains that what followed was retaliation for his attempts to expose the allegedly improper prosecution of Pownall.

On September 27, 2018, Judge Coleman held a hearing on the Commonwealth's motion to bypass a preliminary hearing in the Pownall matter (the "bypass hearing").  During the bypass hearing, Tripp heard Attorney Fortunato "Fred" Perri, defense counsel for Pownall, make comments which led her to believe that there was a leak of grand jury information.  Tripp later testified in a deposition in this pending action about her recollection of the bypass hearing:

> . . . [T]he two things I remember
> clearly is that Mr. Perri said to the Judge
> that he had spoken to one of the assigned,
> meaning assigned detectives is what I took
> that to mean.  And that Detective informed

Mr. Perri that he had never been called
before the grand jury.

And secondarily, Mr. Perri talked
about speaking with an actual witness before
the grand jury, or someone who claimed to be
a witness before the grand jury. And
claimed to be quoted in the presentment.
And told Mr. Perri, which Mr. Perri then
relayed in open court, that the quoted words
in the presentment were not what that person
had said in the grand jury.

According to Tripp, Perri's statements led her to believe that

an OISI detective had leaked grand jury information.

Jacobs maintains in the instant motion that "[o]n

September 27, 2018, he [Jacobs] attempted to report . . . acts

of corruption and criminality by consulting with an attorney."

He maintains attorney-client privilege as to this consultation.

Nevertheless, he admitted in his deposition that he was present

in the Philadelphia Criminal Justice Center on the date of the

bypass hearing. He further stated in the deposition that "to

this day, you [counsel for Tripp], her [Tripp], or no one else

knows what I said to Fred Perri. I do."

Following the bypass hearing, Tripp asked Lieutenant

Hendershot, who headed OISI, to determine who from the unit was

in the courtroom or on the same floor of the Criminal Justice

Center at the time of the hearing. Lieutenant Hendershot then

contacted Jacobs, who admitted that "he [Jacobs] was the person

consulting with the attorney about Tripp's and the DAO [sic]

corruption and criminality." Lieutenant Hendershot relayed his conversation with Jacobs to Tripp. In a deposition for this pending action, Lieutenant Hendershot testified as to his comments to Tripp:

> I [Hendershot] relayed to ADA Tripp that you [Jacobs] were either on the floor or in the room — I don't remember which one — during the hearing. And I don't recall what hearing it was, but it was in reference to Pownall. And if I'm remembering correctly, defense counsel made some type of comment to you about why are we here or how did we get here. And you replied . . . "I don't know. I wasn't involved in the grand jury," or something to that effect.

On October 16, 2018, Jacobs received a court notice to appear before the Pownall grand jury. He sought to have Perri or Attorney Brian McMonagle, also defense counsel for Pownall, represent him through the Fraternal Order of Police ("FOP"). His request was denied because of conflicts of interest and the FOP instead engaged Attorney Gregory Pagano as his lawyer. During his appearance before the grand jury on November 9, 2018, Tripp asked Jacobs whether he had spoken with Perri or any other attorneys representing Pownall about the Pownall shooting. Jacobs responded by invoking his Fifth Amendment privilege against self-incrimination.

Sometime later, the transcripts from the September 27, 2018 bypass hearing and the November 9, 2018 grand jury

proceeding were lost.  Lacking this evidence, Tripp never brought any contempt of court charges against Jacobs.  He concedes that he was never arrested, charged, or indicted and the Pownall grand jury never issued any presentment as to him.

According to Jacobs, Tripp approached him in the Criminal Justice Center on August 1, 2019 and "inform[ed] him of the withdrawal of charges against him."  According to Tripp, she told Jacobs that "the grand jury investigation that had been open into the leak was not going to proceed any further and would be closed."  Consistent with the testimony of Tripp, there is no evidence in the record that there ever were any filed charges against Jacobs to withdraw.  Nonetheless, over the next few weeks Jacobs "kept asking Hendershot for declination [of prosecution memorandum] of Ms. Tripp."  Receiving no response from Hendershot or Tripp,[2] Jacobs filed this lawsuit on October 4, 2019.

On January 18, 2020, during the course of this litigation, Jacobs participated on a podcast titled Search Warrant: Clear and Present Danger.  In the podcast, he made the following statements about the OISI unit, its staffing, and its investigative procedures:

---

2.   Jacobs included in his Response to Defendants' Motions for Summary Judgment a screenshot of texts between himself and Pagano on this subject.  These statements are inadmissible hearsay and cannot be considered on a summary judgment motion.

The unit that I'm assigned to investigates all police discharges that happens in the city and county of Philadelphia.

. . . .

There's six detectives and two supervisors.

. . . .

We're on call at issue 24 hours a day, 7 days a week. So we have set of working hours, but anything outside of those hours, would be on call.

. . . .

Certain detectives go to the scene. We divvy up the responsibilities when an investigation happens. Some officers stay at headquarters. Some go out to the scene. And some do other investigative tasks that is needed at the time.

Jacobs further described in detail the investigation of Ryan

Pownall, including his own interviews of eyewitnesses:

After the shooting occurred, of course we [OISI] were dispatched to handle the investigation.

. . . .

I interviewed the majority of the fact witnesses of this case.

. . . .

I also interviewed a gentleman that gave a statement that was pro police but was not in line with the investigation. And he later recanted his observations.

. . . .

> Based on Mr. Freeman's account, which was
> the adult witness in the back of Officer
> Pownall's vehicle . . . everything in the
> investigation lined up, which led me to
> believe that the shooting was justified.
>
> . . . .
>
> I interviewed a gentleman by the name of
> John Ellis.  John Ellis is the gentleman who
> lied in favor of Officer Pownall.
>
> . . . .
>
> So she [Tripp] had Mr. Freeman's interview.
> I'm sure, you know, not that I was in the
> room. . . . [S]he had all this information
> at her disposal before she impaneled this
> grand jury.

Jacobs further recounted his conversations with prosecutors who handled the matter.  Later, he disparaged the District Attorney's Office as operating "almost like a criminal enterprise."  He also disparaged Tripp:

> She's [Tripp] the worst of the worst in our
> profession.
>
> . . . .
>
> If you're corrupt, you're corrupt.
>
> . . . .
>
> And that's why you have prosecutorial
> misconduct by ADA Tripp.  When she goes into
> a grand jury or she starts the grand jury
> proceeding, and she knows that what she's
> going to be providing to the grand jury is
> false, misleading, or perjury, then we have
> problems here.
>
> . . . .

App 13

> I've been an investigator for 20 years. I
> worked homicide. . . . I'm sure I could
> present and put together my case to have
> Tripp arrested.  I mean, I have enough
> evidence for probable cause.
>
> . . . .
>
> [W]hat she's doing is a crime.  What she did
> in the grand jury is a crime, what she's
> doing against me is a crime.

The title of the podcast episode referenced one of his comments

regarding Tripp, that is that she was "a clear and present

danger to the City [of Philadelphia]."

The Philadelphia Police Department had in effect

directives restricting public statements by police officers.

Relevant to the instant motion are Directive 4.16, which

pertains to "Public Affairs and Release of Information to the

Public" ("Public Affairs Directive"), and Directive 6.10, which

pertains to "Social Media and Networking" ("Social Media

Directive").  Both directives prohibit dissemination of

confidential information by police officers.  Section 2(A) of

the Public Affairs Directive provides that police officers shall

not release information that "violate[s] privacy rights or

jeopardize[s] ongoing investigations or prosecutions."

Section 3(B) of the Public Affairs Directive states that

"[i]nformation . . . should be provided to whatever extent

possible," but not if it would "[a]dversely affect . . . the

investigation or prosecution of a crime" or "disclose

information relative to deployment or staffing."  Section 4(I)
of the Social Media Directive also prohibits police officers
from using "personal insults" and "material that is harassing
[or] defamatory."

The directives allow for narrow exceptions to the
general prohibition on disseminating confidential information
with permission from a higher-ranking official in the
department.  Police officers may speak on behalf of the
Philadelphia Police Department on social media only if they
obtain "express permission from the Police Commissioner or
his/her designee, prior to engaging in such activity."  Social
Media Directive § 3(B)(2)(a).  Section 3F of the Public Affairs
Directive requires that "[a]ll Police Personnel will notify
their Commanding Officer and Public Affairs when contacted by a
media representative for an interview."

But even with permission, police officers must limit
their statements to "circumstances immediately surrounding the
arrest, including the time and place of arrest, resistance,
pursuit, possession and use of weapons" and must not make "any
statements as to the merits of the case."  Public Affairs
Directive §§ 3(G)(1)(d), (H)(2).  Significantly, only "members
of Public Affairs upon conferral with the appropriate Deputy
Commissioner" may disseminate "[a]ny information related to a

App 15

Police involved discharge/shooting." Id. at § 3(I). It is
undisputed that Jacobs was not a member of Public Affairs.

Jacobs maintains that he told Lieutenant Hendershot a
day before the podcast that he would be "doing a podcast." He
further states that on November 26, 2019, he received oral
permission from Deputy Commissioner Wilson to "go public with
his public corruption allegations." This latter statement is at
most a mere scintilla of evidence which no reasonable juror
could find true. See Anderson, 477 U.S. at 252. In a
memorandum from Jacobs to Deputy Commissioner Wilson dated
January 27, 2020, Jacobs wrote that during their conversation on
November 26, 2019, Deputy Commissioner Wilson "asked if I
[Jacobs] would first present this case to the Pennsylvania
Attorney General's Office." Jacobs further wrote, "[y]ou
[Deputy Commissioner Wilson] asked if I [Jacobs] would at least
try first and if I was not successful, I could move forward with
seeking assistance from the U.S. attorney." Contrary to what he
currently asserts, Jacobs made no reference in this memo to
permission from Deputy Commissioner Wilson to "go public" before
he participated in the podcast. Deputy Commissioner Wilson
later confirmed at his deposition that on November 26, 2019, he
summoned Jacobs into his office and advised him to contact the
Pennsylvania Attorney General's Office.

App 16

It is also uncontested that on January 30, 2020,
nearly two weeks after the podcast, Jacobs sent a memorandum to
Police Commissioner Christine Coulter seeking "permission to
release information to the media upon request regarding
corruption reported in my Federal Lawsuit." The memorandum does
not reference any prior permission from Deputy Commissioner
Wilson. The document was stamped "Disapproved" by the Chief
Inspector Detective Bureau on February 3, 2020. A handwritten
note included below the stamp reads: "This violated PPD Policy
re: release info to media." The Jacobs memorandum was also
stamped twice by Deputy Commissioner Wilson, first as "Received"
on February 4, 2020, with a handwritten note "Forward to Law
Dept." Underneath is written "Note 2-6-2020. Law Dept reviewed.
Denial is consistent with department policy." The document was
stamped "Disapproved" and initialed by Deputy Commissioner
Wilson on February 6, 2020. Written underneath this stamp is
"See note," presumably referencing the note regarding review by
the Law Department.

After the podcast, Lieutenant Hendershot referred
Jacobs to the Police Board of Inquiry and requested that he be
charged with violations of the Philadelphia Police Department's
Disciplinary Code. Deputy Commissioner Wilson received a copy
of the podcast and Lieutenant Hendershot's recommendation and
referred the matter for investigation. Defendant Inspector Pace

was assigned to investigate the matter.  Pace determined that

Jacobs should be charged with "conduct unbecoming," "neglect of

duty," and "disobedience."  Jacobs resigned on March 12, 2021

before a hearing was held on the matter.

Meanwhile, this lawsuit continued.  Jacobs made a

number of lengthy amendments to his complaint, adding defendants

and claims, including the claim that he suffered Section 1983

retaliation for participating on the podcast.  On two occasions,

this court granted the motions of Defendants to dismiss the

complaint (Docs. #15-16, #35-36).  Both times, the Court of

Appeals affirmed in part and reversed in part.  See Jacobs v.

City of Philadelphia, 836 F. App'x 120 (3d Cir. 2020);  Jacobs

v. City of Philadelphia, No. 21-2314, 2022 WL 1772989 (3d Cir.

June 1, 2022).  The Court remanded for further proceedings two

claims of Section 1983 retaliation, one claim of Section 1983

conspiracy, and one claim of violations of the Pennsylvania

Whistleblower Law (43 P.S. § 1423; 18 Pa. C.S. § 5301).  See id.

After Jacobs filed his Fifth Amended Complaint, this court

granted the Motion of Defendants to dismiss his state

whistleblower claims (Docs. #66, #67).  The Court of Appeals

dismissed his appeal on the ground that it was not an appealable

order.  See Jacobs v. City of Philadelphia, No. 22-3181, 2023 WL

3529414 (3d Cir. Feb. 14, 2023).

The case proceeded to discovery.  On December 29, 2023, over four years after the initial complaint was filed, the Defendants and Jacobs filed cross-motions for summary judgment.

### III.

Jacobs brings two First Amendment retaliation claims under 42 U.S.C. § 1983, one against Tripp and one against the Philadelphia Police Defendants.  To establish Section 1983 retaliation, a plaintiff must demonstrate that: "(1) [the plaintiff] engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action." Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (internal quotations and citations omitted).  The plaintiff bears the burden of proving each element by a preponderance of the evidence.  See id.  Where the plaintiff is pro se, the court must liberally construe his or her claims. E.g., Higgs v. Atty. Gen. of the U.S., 655 F.3d 333, 339 (3d Cir. 2011), as amended (Sept. 19, 2011).  If the plaintiff is successful, then the burden shifts to the defendant to show "that it would have taken the adverse action even in the absence of the protected conduct."  Balogna, 927 F.3d at 752.

A.

The court first considers Jacobs's claim against Tripp. He maintains that after learning that he had consulted counsel about exposing corruption, she retaliated by commencing a fabricated criminal investigation and prosecution against him. See Jacobs, 2022 WL 1772989 at *6. Tripp counters that she acted on her good faith belief that an OISI detective violated grand jury secrecy and engaged in speech which is not protected by the First Amendment. She further argues that Jacobs suffered no retaliatory action.

Jacobs responds that on September 27, 2018, the day of the bypass hearing, he consulted an unnamed attorney about exposing corruption. He further contends that he could not have leaked information regarding the Pownall grand jury because it is undisputed that he never testified before it as a fact witness. Tripp, he avers, must have discovered that Jacobs had consulted an attorney and fabricated the alleged leak of grand jury information.

The First Amendment does not protect speech that violates grand jury secrecy. E.g., Matter of Subpoena 2018R00776, 947 F.3d 148, 156-59 (3d Cir. 2020); United States v. Smith, 123 F.3d 140, 143-44 (3d Cir. 1997). The Supreme Court has explained that maintaining grand jury secrecy is critical to the proper functioning of criminal proceedings.

-16-   App 20

E.g., United States v. Sells Eng'g, Inc., 463 U.S. 418, 423
(1983).  It protects those who are accused and then exonerated
by the grand jury from suffering stigma and reputational harm.
E.g., Douglas Oil Co. of California v. Petrol Stops Nw., 441
U.S. 211, 219 (1979).  Grand jury secrecy also prevents
preindictment information from influencing witness testimony or
discouraging prospective witnesses from coming forward.  Id.
Finally, it protects witnesses, grand jurors, and the accused
from being subjected to intimidation.  Id.  Pennsylvania courts
also recognize the importance of grand jury secrecy in state
proceedings.  E.g., In re Dauphin County Fourth Investigating
Grand Jury, 19 A.3d 491 (Pa. 2011).

As this court explained in its order dated December
18, 2023 (Doc. #167), Pennsylvania law permits the release of
grand jury information only with permission from the judge who
supervises the grand jury proceedings.  234 Pa. Code R. 556.10.
Jacobs never received such permission from Judge Coleman.  On
the contrary, it is undisputed that Judge Coleman brought him
before the grand jury and administered an oath of secrecy to
him.

As an OISI police detective, Jacobs was part of the
investigation that was presented to the Pownall grand jury.  He
conceded in the podcast that he was deeply involved in the

App 21

Pownall matter and certainly knew that it was before the grand jury:

> I [Jacobs] interviewed the majority of the fact witnesses in this [Pownall] case.
>
> . . . .
>
> [T]he grand jury that she [Tripp] accused me of leaking from, she swore me into that grand jury in May of 2018. . . . The next time . . . was August 2, when she contacted me to prep me for my testimony. And I guess after our conversation not going the way that she liked . . . she decided I was no longer necessary. But if you will look at this investigation, you would see that I'm on the majority of documents . . . .
>
> . . . .
>
> [T]he majority of the fact witnesses and some of the things that we [OISI] used in investigation . . . I'm also attached to those documents and those evidentiary items.
>
> . . . .
>
> What she [Tripp] did in the [Pownall] grand jury is a crime.

Tripp had reason to believe that Perri, Pownall's attorney, had confidential grand jury information. Lieutenant Hendershot had also informed her that Jacobs had consulted with Perri. Thus, Tripp had reason to believe that Jacobs made statements to Perri that violated grand jury secrecy. Jacobs, as noted above, was intimately involved with the Pownall

**App 22**

-18-

investigation and knew who the witnesses were from his
interviews.  Tripp's deposition testimony about Perri's
statements at the bypass hearing is corroborated by other
undisputed evidence in the record.  Hendershot testified that
Jacobs admitted to him that Jacobs spoke with Perri on September
27, 2018.  In his own deposition, Jacobs conceded that he spoke
with Perri when he stated that "no one else knows what I
[Jacobs] said to Fred Perri.  I do."  Finally, Jacobs also
suggested that he spoke with Perri on the podcast:

> [O]ne of the attorneys
> that . . . they [FOP] assigned me is in the
> middle of this fiasco, and we have FOP
> attorneys on retainer, but it's a conflict
> at this time because they're representing
> Officer Pownall . . . .

Jacobs testified that he never had an attorney-client
relationship with Perri.  He never identified any other attorney
who represented him or with whom he consulted.  In sum, no
rational juror could find that Tripp acted against Jacobs
because he had consulted an attorney to report corruption.  See
Anderson, 477 U.S. at 252.

Even if a reasonable juror could find that his speech
was somehow protected by the First Amendment, Jacobs has not
come forward with any evidence of retaliation.  First, Jacobs
asserts that when Tripp first spoke with Lieutenant Hendershot
following the bypass hearing, she threatened to arrest all of

-19-    **App 23**

the officers in his unit if he did not identify the source of the alleged leak of grand jury information. Jacobs never stated that he heard Tripp make this threat or called to the court's attention where he learned about it. Both Tripp and Hendershot, who were the only witnesses to this conversation, specifically deny that Tripp ever made such a threat.

Second, Jacobs claims that Tripp commanded Hendershot to gather information about the privileged conversations that Jacobs had with his counsel on September 27, 2018. There is no evidence on the record that Tripp ever made such a request or that Jacobs ever had counsel. On the contrary, both Tripp and Hendershot separately testified that she merely asked whether a member of his unit had leaked grand jury information to Perri. Such an inquiry would not "deter a person of ordinary firmness" from seeking legal advice. See Baloga, 927 F.3d at 752.

Third, it is not disputed that Tripp summoned Jacobs to testify before the grand jury. But under the circumstances presented here, Tripp's summons was not retaliation. She had a good faith belief that he violated grand jury secrecy – conduct that is not protected under the First Amendment.

Finally, it is undisputed that Jacobs was never arrested or indicted and thus was not prosecuted. See Felker v. Christine, 796 F.Supp. 135, 141 (M.D. Pa.), aff'd 983 F.2d 1050 (3d. Cir. 1992). Nonetheless, he counters that the following

## App 24

evidence shows he was being criminally prosecuted: (1) he was summoned before the Pownall grand jury in October 2018; (2) Tripp made statements to him about "withdrawal of charges" on August 1, 2019; and (3) Lieutenant Hendershot sent an email asking Tripp for a formal declination of prosecution memorandum on January 30, 2020. None of this evidence comes close to establishing a genuine dispute of material fact as to an alleged criminal prosecution. See Fed. R. Civ. P. 56(a). A grand jury summons is not an arrest or indictment. Tripp's statements are also not indicative of arrest or indictment. Finally, Lieutenant Hendershot's email was clearly sent at the direction of Jacobs, who testified that several months earlier he "kept asking Hendershot for a declination of Ms. Tripp." In any case, it is not proof of an arrest or indictment. In sum, Tripp had every right to investigate what she believed to be a grand jury leak by calling Jacobs before the grand jury.

Tripp is entitled to summary judgment on Jacobs's claim of Section 1983 retaliation.

### B.

The court next considers the claim that the Philadelphia Police Defendants retaliated against Jacobs by bringing disciplinary charges against him after the podcast. See Jacobs, 2022 WL 1772989 at *7-*10. The critical issue is whether Jacobs, who was then a public employee of the City of

Philadelphia, engaged in constitutionally protected speech when

he participated on the podcast.  See Baloga, 927 F.3d at 752

(first factor).  The First Amendment protects speech by a public

employee only if three factors are met: (1) the employee spoke

as a citizen, not as a public employee; (2) the speech involved

a matter of public concern; and (3) the employer burdened the

speech without adequate justification under the balancing test

established in Pickering v. Board of Education, 391 U.S. 563,

568 (1968).  Baldassare v. State of N.J., 250 F.3d 188, 195 (3d

Cir. 2001).  "The inquiry into the protected status of speech is

one of law, not fact."  Connick v. Myers, 461 U.S. 138, 148 n.7

(1983).

Pickering is the leading Supreme Court decision on the

issue of the First Amendment's protections of a public

employee's speech.  391 U.S. at 563.  A public school teacher

was terminated for a letter she wrote to a newspaper criticizing

the school board for spending more money on athletics than

academics.  Id. at 565-66.  The Supreme Court held that the

teacher's speech was protected by the First Amendment.  Id. at

573.  It explained that public employees have free speech rights

but also that "the State has interests as an employer in

regulating the speech of its employees that differ significantly

from those it possesses in connection with regulation of the

speech of the citizenry in general."  Id. at 568.  Accordingly,

a court must balance the interests of the employee as a citizen against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. The teacher's interest in critiquing the use of school funds, which was a matter of public concern, outweighed the interests of the school board in maintaining harmony among employees. Id. at 569-70, 573.

Pickering suggested two situations in which the balancing test would weigh in favor of the employer:

> "It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined."

391 U.S. at 570, n. 3. The Court noted that members of the school board were not persons with whom the teacher "would normally be in contact in the course of his daily work." Id at 570-71. Therefore, the case did not present any "question of maintaining either discipline by immediate superiors or harmony among coworkers." Id.

App 27

It is undisputed here that Jacobs made unsupported statements asserting corruption in the Philadelphia District Attorney's Office. Our Court of Appeals has explained that "[t]he public's interest in exposing potential wrongdoing by public employees is especially powerful." Baldassare, 250 F.3d at 198. Nonetheless, Defendants rightly argue that any public interest was far outweighed by the City of Philadelphia's interest in "promoting the work of the OISI Unit, maintaining a close working relationship with the District Attorney's Office, and protecting the confidentiality of grand jury material." See Pickering, 391 U.S. at 568.

First, it is uncontested that Jacobs divulged information on the podcast regarding the OISI unit's general staffing practices, duties, and investigatory procedures. He further revealed confidential information regarding the Pownall investigation while the matter was pending. And he identified by name two witnesses. Jacobs did not receive permission from the Philadelphia Police Department to discuss these details with the media. At most, a rational juror could find that Deputy Commissioner Wilson advised Jacobs to discuss his concerns with the Attorney General's Office. In any event, the Public Affairs Directive is unequivocal that police officers may never disclose "information relative to deployment or staffing," information that would adversely affect "the police investigation and

prosecution of a crime," and "[a]ny information related to a Police involved discharge/shooting."  §§ 3(B), (I).

Jacobs's statements here were in clear violation of the Philadelphia Police Department's Directives.  Those Directives were intended to protect the integrity and efficacy of police investigations and unresolved criminal prosecutions. Even if Jacobs's statements did involve a matter of public concern, the circumstances here favor the employer's interests as contemplated by Pickering.  See 391 U.S. at 570, n. 3.  He was one of only six detectives in a special position of trust in the OISI unit charged with investigating police shootings.  As an investigator in the Pownall matter, he was sworn to secrecy before the Pownall grand jury.  Thus, Jacobs was in a "position[] in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal." Id.

He also harmed his working relationship with his superiors when he acted outside of the chain of command.  The Court of Appeals for the Eighth Circuit was presented with similar facts in Tyler v. City of Mountain Home, Ark. 72 F.3d 568 (8th Cir. 1995).  There, a sergeant in the Mountain Home Police Department was demoted for writing a letter to a sergeant in the Baxter County Sheriff's Department complaining that

certain Sheriff's Department deputies had violated a policy of
both the Police and Sheriff's Departments regarding alcohol
breath tests. Id. at 569. He brought a Section 1983 action
against the chief of police and the city for violating his right
to free speech. Id. The Court of Appeals upheld the district
court's grant of summary judgment on the ground that the
plaintiff did not engage in protected conduct. Id. The Court
explained that "a police department has a more significant
interest than the typical government employer in regulating the
speech activities of its employees" because "police departments
function as paramilitary organizations charged with maintaining
public safety and order." Id. at 570. By acting outside of the
chain of command, the sergeant in the police department "called
into question his working relationship with his superior
officers and at least potentially impaired the police chief's
ability to control the actions of his subordinates." See id.;
Pickering, 391 U.S. at 570, n. 3.

Jacobs likewise acted outside of the chain of command
when he discussed confidential police information on the podcast
without permission from his superiors. His actions not only
violated the Philadelphia Police Department's Directives but
also went against the explicit guidance of his superior officer,
Deputy Commissioner Wilson. See id. Jacobs endangered the
effectiveness of his working relationship between himself and

his superiors.  See id.; Pickering, 391 U.S. at 570, n. 3.

Accordingly, his statements are not protected under Pickering

balancing.  See 391 U.S. at 568.

Second, it is undisputed that during the podcast

Jacobs, among other statements, accused Tripp of being a

criminal and the Philadelphia District Attorney's Office of

operating "almost like a criminal enterprise."  There is no

evidence in the record that Jacobs's comments regarding

corruption in the District Attorney's Office had any basis in

fact.[3]  Nor did he have any basis for his claims that the

District Attorney's Office was conspiring with or improperly

influenced by the Black Lives Matter movement.

Defendants are correct that Jacobs's statements

jeopardized the City of Philadelphia's interest in maintaining a

close working relationship between its Police Department and

District Attorney's Office.  That interest is significantly

greater than the school's interest in prohibiting teachers from

questioning the spending priorities of the school board in

---

3.   The underlying Pownall prosecution has a long and complex
history.  While charges against Pownall were ultimately
dismissed, there is nothing in the public record to indicate any
fabrication of evidence or other corrupt practice by the
Philadelphia District Attorney's Office or the Police
Department.  See Commonwealth v. Pownall, CP-51-CR-0007307-2018
(C.P. Phila. Oct. 17, 2022);  Pownall v. Krasner, 675 F. Supp.
3d 517 (E.D. Pa. 2023), appeal docketed, No. 23-2049 (3d Cir.
Nov. 6, 2023);  see also Commonwealth v. Pownall, 278 A.3d 885
(Pa. 2022).

Pickering. See id. at 568-69. Unlike a teacher's sparse
interactions with a school board member, police detectives work
closely with prosecutors. Id. at 570. As the Tyler court
noted, "the amicable working relationship between the two law
enforcement agencies was important." 72 F.3d at 570. When the
detective makes unfounded accusations that the prosecutor is a
criminal, "the worst of the worst," and a "clear and present
danger," he "seriously undermine[s] the effectiveness of the
working relationship between them." See Pickering, 391 U.S. at
570, n. 3. If police detectives can act as Jacobs did here, the
City of Philadelphia faces a breakdown of the functioning of its
criminal justice system. Accordingly, Jacobs's statements are
not protected speech. See id.

Third, Jacobs during the podcast identified two
witnesses, Freeman and Ellis, whose statements to police matched
those in the Pownall grand jury's presentment.[4] Although the
presentment was released to the public, names of witnesses were
redacted because Pennsylvania law prohibits "pretrial discovery"
of "testimony or other evidence that would disclose the identity

---

4.   Jacobs argues that this information was already made public
in a blog post. See Ralph Cipriano, Detective: D.A. Tampered
with Witness in Officer Involved Shooting, BigTrial.net
(November 18, 2018). However, the blog post summarized Jacobs's
First Amended Complaint in this suit. Jacobs cannot claim that
because he previously used this suit to reveal confidential
information, he was free to disseminate it further.

of any witness or victim." 234 Pa. Code R. 556.10(b)(5)

(emphasis added). The prohibition exists to protect such

persons from intimidation. <u>Id.</u> In this regard, the need for

Jacobs to maintain confidentiality as to the identity of

witnesses in a grand jury proceeding was "so great" that

revealing such information was "permissible grounds for

dismissal." <u>Pickering</u>, 391 U.S. at 570, n. 3. Accordingly, his

speech was not protected under the First Amendment.

        Even if Jacobs's speech was protected, he did not

suffer retaliation. <u>See</u> <u>Baloga</u>, 927 F.3d at 752 (second

factor). It is undisputed that Jacobs retired before the Police

Board of Inquiry held a hearing on the disciplinary charges

against him. A voluntary retirement, even though prompted by

some action of the employer, is not Section 1983 retaliation

unless "a reasonable person under the circumstances would have

felt compelled to resign." <u>Errington v. City of Reading</u>, No.

22-1073, 2022 WL 17336209 at *2 (3d Cir. Nov. 30, 2022) (<u>citing</u>

<u>Colwell v. Rite Aid Corp.</u>, 602 F.3d 495, 502 (3d Cir. 2010));

<u>see also</u> <u>Leheny v. City of Pittsburgh</u>, 183 F.3d 220, 227-28 (3d

Cir. 1999).

        Jacobs had the option to dispute the charges at his

disciplinary hearing. <u>See</u> <u>Errington</u>, 2022 WL 17336209 at *2.

The Philadelphia Police Defendants did not prohibit him from

seeking the advice of counsel. <u>See</u> <u>id.</u> Nor did they demote

**App 33**

him, dock his pay, or place him on administrative leave while
the matter was pending.  See id.  Jacobs did not face conditions
so unpleasant that a reasonable person would have felt compelled
to resign.  See id.; Colwell, 602 F.3d at 502.  Therefore, his
voluntary retirement did not amount to retaliation.

Defendants Lieutenant Hendershot, Deputy Commissioner
Wilson, and Inspector Pace are entitled to summary judgment in
their favor.

IV.

Additionally, Jacobs brings a civil conspiracy claim
against the Philadelphia Police Defendants and Tripp.  To
prevail on a conspiracy claim under 42 U.S.C. § 1983, a
plaintiff must establish that "state actors took concerted
action based on an agreement to deprive the plaintiff of his
constitutional rights, and that there was an actual underlying
constitutional violation of the plaintiff's rights."  Harvard v.
Cesnalis, 973 F.3d 190, 207 (3d Cir. 2020) (internal quotations
omitted).

For the reasons stated above, Jacobs did not engage in
constitutionally protected speech when he revealed grand jury
information to Perri.  He also did not engage in
constitutionally protected speech when he revealed confidential
information on the podcast.  Furthermore, he did not suffer any

retaliation.  Therefore, Jacobs did not suffer any underlying constitutional violation.

There is also nothing in the record to show any agreement among Defendants to violate his rights.  Beginning with the alleged criminal prosecution, there is no evidence of any involvement by Deputy Commissioner Wilson and Inspector Pace.  Separately, Tripp's conversations with Lieutenant Hendershot following the bypass hearing are not evidence of any agreement.  Lieutenant Hendershot was simply relaying information to Tripp without any purpose or plan of action to violate Jacobs's rights.

As to the Philadelphia Police Department's disciplinary charges against Jacobs, there is no evidence that Tripp had any involvement.  Deputy Commissioner Wilson merely referred the matter to Inspector Pace after being notified of the podcast.  Lieutenant Hendershot and Inspector Pace separately and independently conducted investigations into the podcast.  They never met on the subject and separately determined that disciplinary charges were appropriate because Jacobs had violated several directives.  There is simply no evidence of conspiracy.

Defendants are entitled to summary judgment on Jacobs's Section 1983 conspiracy claim.

**App 35**

V.

Defendant Tripp separately argues that her actions were protected by qualified immunity.  Evaluating qualified immunity is appropriate for summary judgment because it is primarily a question of law.  Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000).  Qualified immunity is not "a mere defense to liability," but rather, it is "an immunity from suit."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted).  The court thus considers the issue separately from its discussion of Jacobs's claims against Tripp.

In Saucier v. Katz, the Supreme Court set forth a two-pronged test for a determination of qualified immunity: (a) whether a constitutional or federal right has been violated; and (b) whether that right was "clearly established."  533 U.S. 194, 201 (2001).  If there is no violation or if the right was not clearly established, then the actor is protected by qualified immunity.  Id.  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This court has found that Jacobs did not suffer any violation of his constitutional rights.  Thus, the court need not consider the second prong of the Saucier analysis.

App 36

Even if Tripp did violate Jacobs's First Amendment rights by calling him before the Pownall grand jury, she at that point had absolute immunity.  The Supreme Court held over four decades ago that prosecutors "are absolutely immune from liability under § 1983 for their conduct before grand juries." Imbler v. Pachtman, 424 U.S. 409, 431 n.33 (1976).  Our Court of Appeals held that "direct solicitations of testimony for use in the grand jury proceedings . . . are encompassed within the preparation necessary to present a case and therefore are immunized as involving the prosecutors' advocacy functions." Rose v. Bartle, 871 F.2d 331, 344 (3d Cir. 1989) (internal quotations omitted).  Even when the grand jury was convened to investigate and recommend charges rather than to indict, a prosecutor has absolute immunity from suit.  See Zimmerman v. Corbett, No. 1:13-CV-02788, 2015 WL 539783, at *7 (M.D. Pa. Feb. 10, 2015); see also Rose, 871 F.2d at 345.  Accordingly, Tripp's conduct before the grand jury was protected by absolute immunity.

VI.

Jacobs has also filed a motion for summary judgment. Viewing the facts in the light most favorable to Defendants, for the reasons stated above, the court will deny his motion.

App 37